WYCHE L. JACKSON, Administrator of Hezekiah Erwin, plaintiff in error, vs. JOHN W. JOHNSON and wife, and others, defendants in error.

An administrator appointed in Alabama, residing there, solvent himself, and under bond for the due performance of his trust, cannot, upon coming into this State on a visit or for purposes of business, be called to account here, in a Court of Equity, at the instance of distributees residing here, for waste or maladministration.

In Equity. In Troup Superior Court. Demurrer and Plea. Decided by Judge WARNER. May Term, 1866.

The facts will be found sufficiently stated in the opinion of the Court delivered by :

HARRIS, J.

The defendants in error began suit, in April, 1866, by bill in equity, against plaintiff in error, in Troup Superior Court. They averred in their bill, that Hezekiah Erwin, of Chambers county, Alabama, died in 1858, possessed of a large real and personal estate, of the value of $75,000, in that State; that they are citizens of Georgia, and are the heirs at law of said Erwin. They further allege, that the said Wyche L. Jackson, on the 18th March, 1859, was, by a judgment of the Probate Court of Chambers county, Alabama, appointed the administrator of the estate of said Erwin, and gave bond in the sum of $150,000 for the faithful execution of said trust; (the said Jackson is alleged to be "now of said county of Troup") and, further, that he possessed himself, as such administrator, partly in the county of Troup, and partly in Chambers county, Alabama, of all the property of said Hezekiah, real, personal, and mixed, but that they are unable to state specifically the kind, or to describe it or its value, and pray that said administrator may particularly set forth and describe the same. Complainants allege general mismanagement; compounding of debts against the estate, at figures

merely nominal, and crediting himself, in his accounts, with the full amount of the claim; and the loss of debts due said estate by his delay to sue, so that they became worthless, etc.: and they pray, that the said administrator may set forth his inventories and appraisment bills, and sale bills, and all other items going to show his indebtedness to complainants, and that he may be held to strict proof of all the statements set up in his answer by way of discharging himself; that he may, at said Superior Court in Troup county, be required to appear and answer complainants' just demands; *and that the Court may require a full, fair, and complete settlement to be made between complainants and said Jackson, and that he be required to pay over to each of complainants his or her share of said estate.*

The bill is entitled "for account and settlement."

By entry of the sheriff, it appears that Wyche L. Jackson was served in West Point, Georgia, with a copy of the bill, on the 23d April, 1866.

To this bill, Jackson filed a demurrer, plea to the jurisdiction, and an answer.

The demurrer submitted, that by the bill the complainants shewed that Troup Superior Court had no jurisdiction of the subject matter of complainant, nor of the defendant, in the capacity in which he was complained of; and that, by their own statement, complainants are not entitled to the relief asked; and, generally, that there is no equity in the bill; and concluded with a prayer that the bill be dismissed.

The plea alleged, that defendant is a citizen of Alabama, and resides there; that the estate of Hezekiah Erwin is being administered in Alabama, as speedily as possible; that large suits (stating them) are pending against defendant, as administrator there; that no further distribution among the heirs can be made until said suits are determined; and that the sum in hand, about $3,000, will be utterly insufficient to pay the debts sued, if established, etc.: all of which is plead in bar to the discovery and relief prayed.

The plea is sworn to.

Jackson vs. Johnson et al.

The question made by the record, whether Jackson, administrator with an Alabama commission, of real and personal property within said State, was amenable to such a suit as that instituted against him in Georgia, could well have been determined upon the demurrer; for the bill set forth every material fact necessary to its adjudication. The case, however, by an arrangement of counsel, was argued below upon the demurrer and plea together. They were overruled; and that decision is brought before this tribunal for review.

We think the learned Judge erred in not sustaining the demurrer and plea.

There are, unquestionably, decided cases—commencing with *Dowdale's case*, 6 *Coke's Repts.*—those reported in *4th and 8th Serg & Rawle*, and, especially, that of *McNamara in 7th Paige R.*, 239—which go far to sustain the decision made by him. This class of cases, with the exception of the case in Paige, when examined, will be found to rest on the naked resolution of the case in Coke, and which was made upon an issue found upon the pleadings, rather than upon a course of reasoning in which the powers of an executor or, administrator, his liabilities to account to the appointing power, and the insuperable difficulties which would spring from the exercise of jurisdiction over them by a foreign tribunal, were considered.

The Pennsylvania cases do little more than repeat the resolution of *Dowdale's case*, and furnish us with as little argument.

The case of *McNamara vs. Dwyer*, 7 *Paige* 239, appears to have been decided by Chancellor Walworth upon reasons arising *ab inconvenienti;* among others, such as this : that an executor not being required to give security, he might remove to another State with the property, and that there would be no possibility of compelling him to an account by a resort to the tribunals of the State where the will was admitted to probate. It is remarkable that his decision is not based upon any stated adjudicated case. After mentioning

the opinion of Justice Story in his greatest work, (*Con fiict of Laws, sections* 422, 513, 514,) that a foreign administrator could not be sued elsewhere than in the Courts of the State granting administration, he adds, that he had looked through the cases referred to by Justice Story, but that he did not find one where it had been *directly* decided.

Now, whatever may be the value of this opinion of the Chancellor, and we are ready to admit that we are impressed with the pertinency and force of some of the inconveniences enumerated which might ensue from refusing jurisdiction over a foreign executor, we are constrained to think that the case of *McNamara* cannot be sustained upon either principle or authority. The argument seems to be a *petitio principii.* The decision is adverse to that of *Doolittle vs. Lewis,* 7 *John Ch. R.,* 45, wherein his great predecessor, Chancellor Kent, held, "that a party can not sue or *defend* as executor or administrator under the authority of a foreign Court of Probates. Our Courts recognize no foreign administrator within our limits. He can act here only when clothed with authority by our law. Nothing is clearer than that administration can not extend beyond the territorial limits of the State granting it."

As *Dowdale's case* has not been followed in England, and has been denied in America by our most distinguished commentators on Municipal and International jurisprudence, and for the reasons assigned, we put it out of our path. No other common law authority has been cited by counsel for complainants; nor have we, in a careful search, been able to find a case sustaining the right claimed for the Courts of Georgia,—that of compelling, here, by suit, a foreign administrator to account and make final settlement with creditors and the heirs of his intestate.

The question, then, appears to be *res integra*; and as such, we are free, in the absence of positive law or direct adjudication, to give it such decision as will most certainly carry into effect acknowledged principles of the common law, relieve our Courts of troublesome and vexatious litigation, and

promote the harmony and intercouse of States. In thus considering it, we are not unmindful of the case of *Sanford, administrator, vs. Thompson and wife*, 18 *Ga. R.* 554. That case was, shortly, as follows: Sanford, administrator in Georgia, of Walker, who died intestate in Alabama, was sued by the judgment creditors, of Alabama, as also by the heirs at law. Administration had been granted in Alabama on Walker's estate. Sanford, harrassed by suits, and fearing he might be involved in difficulty by paying over the estate of Walker in his hands, filed a bill *for instruction*. The Circuit Judge sustained the demurrer taken to it; and that decision was brought to the Supreme Court for review, and was reversed. Judge Benning, in the course of his opinion, remarked, " the domicil of the intestate and of *all* the claimants upon the assets, was, it will be remembered, in Alabama: no citizen of Georgia had any right or interest involved in the case." This decision is referred to, not as furnishing a distinct adjudication on the direct question under consideration, but to express our approbation of the instruction given to the Georgia administrator, viz: that he should pay over the assets in his hands, to the administrator of Walker in Alabama, thus remitting the litigation to its proper forum, the domicil of the intestate.

There is a breadth and liberality of view running through the opinion of this eminent Judge, which evinces that his mind is deeply imbued with the learning and spirit of those continental and American publicists who have, for the last half century, been employed in systematizing a code of international comity ; but that spirit is at variance with the quotation we have just made from his opinion. If the Judge meant to make the fact of the residence or citizenship of the creditors and heirs of Walker, the controlling reason for his judgment, we can not concur in the reason, whilst we most readily approve the judgment. Citizenship, or residence on the soil of Georgia, it is apprehended, furnishes no legal or proper reason for the exercise of jurisdiction, in behalf of plaintiffs. The citizen of Pennsylvania, or of any othe State,

the alien of a friendly nation, are each and all equally entitled to sue in our Courts, as our own citizens may. The jurisdiction claimed or exercised for a Georgian, is the right of the others, equally. There is not and cannot, of necessity, be any discrimination in such rights and privileges. If this be true, the fact that no Georgia citizen was a plaintiff in that case could not have been a sound or satisfactory reason for the judgment. Upon principle, the Alabama creditor or heir had as much right to a decision by a Georgia Court, in that case, as a Georgia citizen could have had. The true ground upon which that judgment was placed, or ought to have been, was, that the assets of Walker collected in Georgia would have to be distributed by the laws of Alabama; and hence, they were to be remitted there for such purpose.

The effect of the decision in 18th Geo. is to make administrations of estates, in States other than that of the domicil, ancillary to that of the domicil. A step or two yet beyond this, as the allowance of the administrator of the domicil to administer under his foreign letters, property here, if the security on his bond is ample enough, would, it is thought, remove difficulties perpetually recurring. But this can be done only by wise and liberal legislation. The time is near at hand when its utility will lead to it. If it be true that personal property has no situs, no locality, and is governed, wherever existing, by the law of the domicil, no satisfactory reason can be rendered why this principle should be checked in its full operation, by statutes restricting the powers of an administrator to the limits of the State granting administration. We are aware that Chancellor Kent expressed the opinion, that a payment by a debtor of an intestate, of another State, to the administrator of the domicil, was a complete protection to such debtor against a demand made by the administrator of the State in which the debtor resided. This opinion is a necessary corollary from the doctrine that choses in action have no locality. It were much to be desired that all judges had boldness and independence, like this great jurist, to pursue principle wherever it leads. The

anomolies which exist are to be removed only by salutary legislation.

In the case before us, it was agreed that there was no property, either real or personal, of Erwin, in Georgia. How, then, could an effectual decree be made by our Courts? Jackson, as a foreign administrator, is not, as such, recognized here: without such recognition, what lawful act can he do? He owes no allegiance, as administrator, to this jurisdiction. How, as there is no property here to be sequestered or sold or divided under a decree, if obtained here, is that decree to be enforced? The decree would have no extra territorial force : it cannot operate in Alabama. Will not a decree here be simply *brutum fulmen*, unless it may be enforced by the imprisonment of the foreign administrator. Will any Court stultify itself by granting an attachment for contempt in disobeying a decree against him as administrator, directing him to divide and deliver over property in kind, when, by existing laws and the unvarying decisions of all Courts, no foreign administrator can be recognized? Can it be that a hope is indulged, that when a decree shall have been gotten here, that the administrator will, to avoid imprisonment, clandestinely withdraw the assests of the estate from Alabama, to satisfy it? Will his securities in Alabama supinely permit him to withdraw them from the jurisdiction to which they belong, and suffer them to be distributed under a Georgia decree, instead of an Alabama decree, by which last only can they be protected in their security-ship? But, suppose the whole process and powers of a Georgia Court shall have been exerted to give effect to its decree, without success, and complainants should be driven to a suit in Alabama upon the decree obtained here, can any man indulge the expectation that an Alabama Court will allow such a judgment to shut out the defences and resistance which her administrator made here to it? If opened up, can any one be so credulous as to think that the comity of States (which has been so utterly disregarded by our Courts) will

induce her tribunals to lend their aid to give effect to a decree thus obtained,—a decree infringing her laws, and compelling her officer to account elsewhere than to herself?

If these ideas are pondered and pursued, they cannot but awaken a deep solicitude as to the consequences which are likely to ensue from the disregard of that comity which, when analized, will be found to be nothing but the expansion of familiar common law principles, to meet the exigencies of commerce and intercourse, and are, as such, already incorporated into the jurisprudence of nearly all the States. There are many other subjects than that of foreign administrations, requiring the like application of these common law principles, in a spirit of liberality and confidence, to prevent conflict; as, marriage and divorces in foreign States, wills, legitimacy, succession, foreign contracts, etc. Whilst we are sensible that many questions springing out of these subjects are yet vexed, and have not been reduced to any uniform rule demanding our obedience or commanding our assent, we are strongly persuaded that most of them admit of easy and just resolution, if the Courts of the several States would exhibit, in their decisions, more confidence in the justice and impartiality of the laws of each other, as well as in their honest administration. Comity is reciprocity. It can not be that the laws of the several States of the Union differ so materially, *now*, in policy or in the nature of their institutions, as to require the application of that unquestionable defensive right of every sovereignty,—that of protecting its citizens against the operation of the laws or doctrines of another State, incompatible with their safety, or injurious to their interest. Will it not be in time to call into action this dormant energy of restraint or prohibition, when a case of palpable wrong has been done, or is sought to be done, to its citizens, by the allowance of the laws of another State operation within its limits?

Resuming the thread of this opinion a little more closely, from which we were led aside to express some general views, we feel that some comment is called for upon many of the

American cases which have directly or incidentally adjudicated points involving a conflict of laws; especially, as in them apparent contradictions meet the eye of every one who has gone through them with care. We do not purpose taking up case by case, or indeed any one of them, with a view to illustrate our remark. These contradictions, we are inclined to think, have arisen rather from a misapplication of established principles than by decisions on wrong principles. Thus, we find the entire class of cases referred to fully recognizing the following general doctrines of law :

That every State possesses exclusive sovereignty and jurisdiction within its territory. That the laws of every State affect and bind, directly, property, whether real or personal, within its territorial limits. That no State can, by its laws, control property or persons out of its territory. That the obligatory character and force of the laws of any State within the limits of another State, depend upon the laws, jurisprudence, and polity of the latter, and its express or tacit consent. That a State may entirely prohibit the operation of the laws of another, within its own territory, may modify their effect, or give full operation to their provisions. That no State can be called on to sacrifice her own interests in favor of another, or to enforce doctrines incompatible with her happiness, her safety, or violative of her sense of justice.

These are to be enforced by each State for itself; but not in such a mode as to make inoperative, or conflicting with other principles of law of equal obligation ; as, for instance, that the descent and distribution of real property is to be disposed of according to the *lex rei sitæ ;* and that personal property, without reference to the locality in which it may happen to be, upon a man dying intestate, in its descent and distribution, will be governed by the *lex domicilii ;* that a foreign executor, administrator, or guardian can not, as such, either sue or be sued without the jurisdiction from which they derive their authority.

May the confusion which clouds these decisions be attributed to the omission to observe this cardinal rule,—that the laws of every State, in force within its own limits, ought to have the same force every where, so far as they do not prejudice the rights of other States or of their citizens?

Looking to the case before us, we are at a loss to discover upon what principle it was begun or retained, if it was not on the ground that complainants were citizens of Georgia, and that it was the duty of our Courts to take care of their interests as such. We have, in commenting on the case in 18th *Geo.*, already expressed our dissent to any doctrine which makes a discrimination among suitors; for if there be jurisdiction over a subject, the right of suit belongs equally to all. Nothing could be, or ought to be, more offensive to other States, than such a selfish policy. Let the States of the Federal Union adopt, severally, each for itself, such a rule of conduct, and it will be palpable that there could be no such thing as comity : on the contrary, perpetual discord and irritating jealousies. If begun or retained upon the score of the inconvenience to which our citizens would be subjected by compelling them to resort for the maintenance of their rights to foreign tribunals, unless the foreign administrator was held amenable here, it seems to 'be an appropriate answer to reply,—is it not to be found in all things? Can any large or just rule be carried out, without individual cases of hardship resulting? Should such inconvenience as that mentioned, prevent the application of a rule of undoubted utility?

If the common law rules herein stated are sound, may it not be pertinently asked, Why should a Court in Georgia undertake to adjudicate a case involving all these principles, when, at the same time, it is conceded that the entire estate of Erwin is in Alabama, in the course of administration? It is to be presumed that the vouchers of this administrator are on file in the Probate Court of Alabama; that his accounts have been rendered there, revised and scrutinized, under exceptions to them by creditors or heirs, and been

passed upon by a judicial officer.  Why should such administrator be put to the trouble and expense of procuring exemplifications of those accounts and vouchers, to answer a suit in a remote jurisdiction—in another State—where new forms of procedure obtain, perhaps new rules of evidence applied? Why should the labor of acquainting themselves with the jurisprudence of another State, be unnecessarily imposed on the bench and bar, so as to fit them for the duties of expounding and applying those laws?  Nor will the labor stop with learning the laws of one foreign state, so as to meet a pending case: other cases, under other State laws, may arise; and those laws, too, must be learned.  The acquisition of so many systems of law cannot be made by any intellect, however capacious.

The absurdity of the claim of jurisdiction over a foreign administrator, to compel an account and settlement, may be more fully shown thus: we will suppose that, as well as in Georgia, creditors and heirs of an intestate of Alabama are citizens of South Carolina, North Carolina, Virginia, Maryland, Pennsylvania, and New York; that, by some agency they shall severally learn that the Alabama administrator designs to visit New York to purchase a stock of goods.  The administrator, as he touches the soil of Georgia at some railroad station, is arrested by the heir in Georgia, by *Quia Timet* or *Ne Exeat;* the administrator gives bond, and is released, and proceeds on his route; when he reaches Charleston, he is arrested by a creditor, under similar process; he gives bond again, is released, and resumes his journey; at Weldon, Richmond, Baltimore, Philadelphia, and New York, a creditor or heir of his intestate is found eager to secure his claim; at each of these points he undergoes arrest, as he had before in Georgia and South Carolina, and to free himself from imprisonment, he is compelled to give bond, if he can, if not, to be incarcerated.  Thus, the Alabama administrator has to run the gauntlet of seven conflicting judiciaries, each asserting full power to compel him to account and pay over.  Is it not apparent that if any one

66

of these seven States where suit has been begun, has the jurisdiction claimed, the other six have it also? Such a state of things might occur; but whether it does or not, it exhibits the naked deformity of the assertion of jurisdiction by seven States, at the same moment, against the administrator of Alabama, who is accountable to these suitors only in the Courts of the State from which he derives his powers. Let us suppose, further, each of the seven suits carried to judgment—and each dissimilar—which of them is he to obey?

Who would become an administrator if thus liable to suits? Who would be rash enough to become the security of an administrator, if he is to be affected by each of these judgments?

Now, whilst the comity of States, founded upon the common law principles mentioned in this opinion, demands a disclaimer of a jurisdiction in the Courts of Georgia to compel the Alabama administrator of Erwin to an account and distribution here, of the estate in his hands, we would not be understood as denying, that in some peculiar cases, that our Courts might not lend their aid in compelling a foreign administrator, executor, or guardian, who had absconded, or removed the trust property illegally without its appropriate jurisdiction, or was palpably converting that property to his own use, or doing anything clearly in violation of his trust, and to the prejudice of creditors and heirs, on the soil of Georgia, to give security, or arrest the injury likely to be done, in such form, and by such means, as will best comport with the limited power exercised—a power to be employed with great caution, upon a well supported case, and solely as ancillary to the decrees and judgments of the State from which he holds his commission.

To this extent they may exercise jurisdiction, but not beyond.

We conclude by saying, that we believe both principle and authority fully establish the doctrine, that a foreign administrator, executor, or guardian who brings or transmits

property here which he has received by foreign commission, or if he is personally present, are not, either in their representative capacity or personally, liable to a suit here at the instance of either creditor, heir, legatee, or ward; nor is such property liable here to their claims; but all of them must resort for satisfaction to the original forum of their appointment.

We, therefore, reverse the judgment below, and order the bill of complainants to be dismissed.

DOUGHERTY, for plaintiff in error.

BIGHAM, for defendants.