## 58403. COMMERCIAL CREDIT PLAN, INC. v. PARKER et al.

BIRDSONG, Judge.

We granted interlocutory appeal to the plaintiff below, Commercial Credit Plan, Inc. Under scrutiny here

is the trial court's ruling that public policy considerations demand that Georgia law control the enforceability of a loan made in South Carolina to the appellees who are Georgia residents, and of the appellees' note for $2,886.48 which was executed and made payable in South Carolina. In October, 1974, the Parkers went to South Carolina originally to borrow $500 from Commercial Credit after having received advertisements, or "solicitations," which Commercial Credit sent the Parkers, apparently because they had previously been good customers of Commercial Credit through assignment to Commercial Credit of their automobile note by a Georgia automobile dealer. To obtain the $500, the Parkers were required to borrow $2,121.84 in order to pay off a prior note to a finance company in Georgia; $1,512 was disbursed to that Georgia finance company, and the Parkers received $609.84. The note executed by the Parkers in South Carolina extended payment to 36 months, and was secured by the Parker's household goods at their Georgia residence.

Appellant relies on the South Carolina Consumer Finance Law (S. C. Code § 8-797). For purposes of this appeal, it is conceded by argument that the loan contract and note are valid and enforceable under South Carolina law but would not be in Georgia, since in 1974 when the Parkers executed the note, under the Georgia Industrial Loan Act (Code Ann. Ch. 25-3) (hereinafter referred to as ILA), loan contracts extending in excess of 24 months were prohibited; and that consequently the loan was usurious in violation of ILA provisions. Implicit in the trial court's ruling is the conclusion that the note was made, executed and to be performed in South Carolina and that South Carolina is the lex loci contractus; we have no doubt that this is so (see especially *Goodrich v. Williams,* 50 Ga. 425 (1), 434), nor is a contrary contention properly made by the Parkers on appeal.

The sole question before this court is whether, as the trial court ruled, "public policy considerations in this instance [as expressed by the ILA], outweigh comity considerations" and compel us to apply Georgia law, in accordance with *Nasco v. Gimbert,* 239 Ga. 675, 676 (238 SE2d 368). More precisely, the point arises by virtue of the

holding in *Hodges v. Community Loan &c. Corp.*, 234 Ga. 427, 430 (216 SE2d 274) that "The declaration in the Industrial Loan Act (Code § 25-9903) that any loan contract made in violation of the Act is 'null and void' . . . means that the contract is illegal and against the public policy of the state, and that any money loaned under such a contract cannot be recovered. [Cit.] It is fruitless to debate whether a contract violating the [ILA] is as evil as some other contract to engage in an immoral or illegal act. The General Assembly has the right to declare what is void as against the public policy of the state." *Held:*

1. Acknowledging, as it has been held, that the provisions of the ILA constitute an expression of public policy in Georgia (*Hodges,* Id.) does it inexorably follow that loan contracts made in another state, which are valid and enforceable in that other state but under the Georgia ILA would not be if the loan were made in Georgia, will not be enforced according to the law of the state where the contract was made? We do not think such a result is justified.

The Georgia legislature has already expressed, explicitly, the very ancient policy of Georgia with regard to the treatment of notes made in other states, bearing interest greater than that which is allowed in Georgia: "Every contract shall bear interest according to the law of the place of the contract . . ." (Code Ann. § 57-106). What is usurious interest in a Georgia contract is plainly stated (Code § 57-101) and the penalty for exacting it (Code Ann. § 57-112) is grounded on an early appreciation of the practice as being "odious" and "greatly prejudicial to the welfare of the planters and others." *Union Savings Bank &c. Co. v. Dottenheim,* 107 Ga. 606, 610, 613-614 (34 SE 217). Under the common law, the exaction of usurious rates of interest was "a heinous offense," and, in Georgia, by legislation of the colony in 1759, the usurer not only had his contract utterly voided, but would forfeit and lose "the treble value of the moneys, wares and merchandises, and other things" which were the subject matter of the transaction. See *Union Savings Bank,* Id., p. 610. A stronger expression of public policy can hardly be imagined. Today, and since 1822 (Ga. L. 1822, p. 139), the penalty for usury is less severe, but nevertheless reflects

the attitude that the practice is one offensive to the public policy in Georgia and to the interests of Georgia citizens. The legislature has not, however, been constrained to extend this policy to the treatment of money contracts which are valid in the state where they are made and to be performed, but rather, as we have said, has expressly provided in accordance with the common law that the laws of that other state shall govern the obligation even though it is a usurious one under Georgia law (Code § 57-106; *Mayor of Griffin v. Inman, Swann & Co.,* 57 Ga. 370, 371 (8); *Vinson v. Platt & McKenzie,* 21 Ga. 135, 139). We conclude from the intrastate nature of the state's regard for money contracts and for the protection of Georgia debtors from unscrupulous exactions, that the public policy of the state is generally limited to enforcement of contracts to be performed in this state, and does not extend to the enforcement of valid contracts made in other states, for which the rules of comity will be observed (Code § 102-110).

The same principle has consistently been applied to the treatment of money contracts which would, if made in Georgia, fall under the provisions of the ILA. See *Midland Guardian Co. v. Varnadore,* 148 Ga. App. 742 (252 SE2d 685); *Clark v. Transouth Financial Corp.,* 142 Ga. App. 389, 390 (236 SE2d 135); *Liberty Loan Corp. v. Crowder,* 116 Ga. App. 280 (157 SE2d 52). Admittedly, the Act's severe penalty provisions constitute a strong expression of public policy in Georgia (*Hodges,* supra, p. 430-431), but the determinative issue here is, toward what end is that public policy directed? The trial court held that the policy involved in the ILA is "manifest — to protect Georgia citizens against usury." However, the terms of the Act itself provide that its application is to "persons engaged in the business of *making loans . . . in the State of Georgia,*" and "*bona fide engaged in making loans . . . in the state of Georgia*" (Code § 25-307). (Emphasis supplied.) As to the enforcement in Georgia of loan contracts made in another state, and valid under the laws of that state; and as to any rights of Georgia borrowers entering into such a valid contract in another state, the Act is utterly silent. Nevertheless, appellee urges us to interpret the Act as seeking quintessentially to protect the Georgia borrower

from loans, wherever made, that would offend its terms. We do not agree with that proposition. The ILA unquestionably had its inception in the abuses perpetrated against the necessitous borrower by unscrupulous moneylenders; but to the end of protecting the necessitous borrower, "the *purpose* of the . . . Act . . . is to eliminate the abuses which grow from *unregulated* entities engaging in the small loan business." (Emphasis supplied.) *Marshall v. Fulton Nat. Bank,* 145 Ga. App. 190 (243 SE2d 266). The entire substance of the Act is directed toward the *regulation* of lenders within a certain class "engaged in the business of *making loans . . . in the State of Georgia,* " and *"bona fide engaged in making loans . . . in the state of Georgia"* (Code § 25-307).

The former Small Loan Act contained a penalty provision seemingly, in part, consistent with the interpretation urged upon us by the appellee. Section 17 of that early act (Michie's Code, § 1770 (73)), provided that "no loan for which a greater rate of interest or charge than is allowed by this act has been contracted for or received, *wherever made* shall be enforced in this State, *and any person in any wise participating therein in this State shall be subject to the provisions of this act."* (Emphasis supplied.) It was held, in *Folsom v. Continental Adjustment Corp.,* 48 Ga. App. 435, 438 (172 SE 833), that since the note in that case was "executed and to be performed in a foreign jurisdiction *without any person in any wise participating in this State in the making of such loan,* [and it was therefore] wholly a foreign contract, [it was] not entitled to the privileges or subject to the penalties of the 'small-loan act.' " (Emphasis supplied.)

What we have extracted here, that the ILA expresses the public policy towards assiduous regulation of and compliance by those who make certain loans in Georgia, leaves us in harmony with the comity heretofore afforded similar laws in other states when loan contracts valid thereunder have been sought to be enforced in Georgia. See *Midland Guardian Co.,* supra; *Clark,* supra; and *Liberty Loan Corp.,* supra. The general posture of the Georgia Act being one of regulation in this state, we must conclude that the state's policy concern is that this class of moneylender be regulated, and be made subject to certain

well-defined restrictions designed to prevent abusive moneylending practices, and if a loan contract was made in a state which seeks a similar object and regulates its lenders accordingly, then affording comity to the laws of that state which render the loan contract valid is not offensive to the public policy of this state as expressed in our own ILA.

The necessitous Georgia borrower who goes outside the state and executes a loan contract valid in the foreign jurisdiction, and who nonetheless finds himself subject to an obligation which we find *particularly* distasteful to enforce in Georgia, will not be deprived of protection of Georgia laws. It was said in *Jackson v. Johnson,* 34 Ga. 511, 518: "Comity is reciprocity. It can not be that the laws of the several States of the Union differ so materially, *now,* in policy or in the nature of their institutions, as to require the application of that unquestionable defensive right of every sovereignty, — that of protecting its citizens against the operation of the laws or doctrines of another State, incompatible with their safety, or injurious to their interest. Will [there not be] . . . time to call into action this dormant energy of restraint or prohibition, when a case of palpable wrong has been done, or is sought to be done, to its citizens, by the allowance of the laws of another State operating within its limits?" This is exactly what was done in *Folsom v. Continental Adjustment Corp.,* supra, p. 438-439, which we have discussed above, and where it was held that the note was executed and to be performed in a foreign jurisdiction "without any person in any wise participating in this state in the making of such loan" and therefore was not subject to the penalties of the Small Loan Act. Having so held, the court nevertheless found that the interest on that note, being more than five times the rate authorized under the general Georgia usury statute, was "as a matter of law, unreasonable and unconscionable and therefore incapable of enforcement by the courts of this State." We think this is a better posture than what the appellee promotes. As to our giving comity to the laws of the foreign jurisdiction, appellee deplores the potential for foreign moneylenders to lend money to Georgia borrowers in evasion of the Georgia ILA, and certainly there is something to this proposition.

But we think it would be even more unattractive, and courts and creditors in other states would find it monstrous indeed if we provided Georgia debtors with the additional "tasty dessert" (see General Finance Corp. of Georgia v. Sprouse 577 F2d 989, 994) of being able to make a valid and enforceable loan in another state and then escape back home and hide behind our public policy to keep the principal and the interest too. (Code § 25-9903).

All that we have said here is well said in Kinney Loan &c. Co. v. Sumner, 159 Neb. 57 (65 NW2d 240). The Nebraska Industrial Loan Act in effect in 1954, on the date of that decision, addressed the very question now before us and very clearly provided: "No loan, made outside this state, in the amount . . . of one thousand dollars or less, for which a greater rate of interest, consideration or charges than is permitted by [this act] . . . shall be enforced in this state and every person, in anywise participating therein in this state, shall be subject to the provisions of this act; *Provided, that the foregoing shall not apply to loans legally made in any other state under and in accordance with a regulatory small loan law similar in principle to this act.*" (Emphasis supplied.) In interpreting this provision, the Nebraska court held that the Nebraska legislature "evidently recognized that because of modern transportation and communication facilities, residents of this state and other states carry on frequent interchanges of business, including the borrowing and lending of money by people of one state in another, and that to permit enforcement in this state of bona fide contracts therefor lawfully made and to be performed in another state would not . . . be contrary to the public policy of this state."

The foreign loan contract before us is valid and enforceable in the state where made, under the authority of laws which license, control, and regulate the moneylending business of that state. Those laws are similar in principle and purpose to the objects and provisions of the Georgia ILA, and "seek to combat the reservation of extortionate and oppressive rates," *Kinney*, supra. Therefore in this case and perhaps in other cases as provided in Code § 57-106, the enforcement of that note in

Georgia will not be oppressive to the public policy of this state. If so palpable a wrong would be done by the enforcement of such a loan contract as to raise a result unconscionable and unreasonable in this state, then there will be time to deny its enforcement in that particular case. (*Jackson,* supra).

2. To show such a palpable wrong, appellees contend specifically that the note made, executed, and to be performed within 36 months in South Carolina, and which appellees concede would be valid under South Carolina law, is usurious in Georgia because on the date of its execution, the Georgia ILA prohibited loan contracts extending in excess of 24 months. (Formerly Code § 25-315). That term has now been extended in Georgia to 36 months; the term was valid in South Carolina and voluntarily entered into by appellees under the laws of that state. We therefore do not find the terms of the note so oppressive, unconscionable and unreasonable as a matter of law as to refuse comity to South Carolina law in this instance and to refuse to enforce those terms in favor of a South Carolina creditor, making a valid loan in good faith under the laws of South Carolina. (See also, Code § 25-9903(c)).

We reverse and direct that the loan contract and note be construed in accordance with the laws of South Carolina.

*Judgment reversed with direction. Quillian, P. J., and Smith, J., concur.*

ARGUED SEPTEMBER 11, 1979 — DECIDED
NOVEMBER 19, 1979.

*Joseph S. Skelton, Walter E. Leggett, Jr.,* for appellant.

*Joanna Hannah,* for appellees.