**NORDSON CORPORATION,**
**Plaintiff-Appellee,**

v.

**Joseph PLASSCHAERT and Ranier Corporation, Defendants-Appellants.**

**No. 80–7855.**

United States Court of Appeals,
Eleventh Circuit.

May 6, 1982.

Edward J. Bauer, Decatur, Ga., for defendants-appellants.

Alston, Miller & Gaines, Franklin R. Nix, Atlanta, Ga., Wood, Herron & Evans, J. Robert Chambers, Cincinnati, Ohio, for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT and VANCE, Circuit Judges.

GODBOLD, Chief Judge:

In this diversity action the District Court, N.D. Ga., issued a preliminary injunction enjoining Joseph Plasschaert, a former employee of Nordson Corporation, from using or disclosing confidential information concerning Nordson's processes and products. The court ordered Plasschaert to return to Nordson all records of confidential information in his possession. It further enjoined him from engaging in any work until May 15, 1982 involving: (1) research, development or engineering relating to hot-melt [1] application equipment, (2) the promotion or sale of hot-melt application equipment in the United States, Canada, and Western Europe, or (3) situations in which loyal fulfillment of his duties and responsibilities would inherently call upon him to reveal or otherwise to use proprietary or confidential information or trade secrets acquired from Nordson or relating to Nordson's activities.

Plasschaert appeals, and we affirm.

## I.

Nordson, an Ohio corporation headquartered in Amherst, Ohio, is the world's leading manufacturer of application equipment for hot-melt adhesives. Plasschaert, a Dutch subject, was employed in 1972 to serve as an area sales manager of hot-melt adhesive equipment in southern Holland. In 1975 he transferred to Brussels, Belgium, to become marketing coordinator of the European market, and there in 1977 he was promoted to marketing manager. In November 1978 Nordson transferred Plasschaert to its Norcross, Georgia, Packaging and Assembly Division office as a marketing specialist-product assembly. In this capacity he was to ascertain new uses for hot-melt equipment but was not to sell or engineer the products.

In connection with this last transfer Plasschaert executed an "Employee Agreement" on November 15, 1978, in Doraville, Georgia, which contained the following excerpts:

> I am employed or desire to be employed by Nordson in a capacity in which I may receive or contribute to confidential information. In consideration of such employment or continued employment, and in consideration of being given access to confidential information, I agree to the following:
>
> 1. In this agreement:
>
> \*     \*     \*     \*     \*     \*
>
> b. Confidential Information means information, not generally known and proprietary to Nordson, about Nordson's processes and products, including infor-

---

1. Hot-melt adhesives essentially are plastic compounds that liquify when heated. The adhesive is pumped through heated hoses and nozzles and applied to the material to be joined, where it forms a bond almost instantly as it cools. Hot-melt generally is used either to seal packages or to join parts in assembling products. Nordson was among the first to develop this technology and currently manufactures approximately 80% of all hot-melt application equipment, which it sells throughout the industrialized world.

mation relating to research, development, manufacture, purchasing, accounting, engineering, marketing, merchandising and selling. All information disclosed to me, or to which I obtain access, during the period of my employment, which I have reasonable basis to believe to be Confidential Information, or which I have reasonable basis to believe Nordson treats as being Confidential Information, shall be presumed to be Confidential Information.

\* \* \* \* \* \*

2. Except as required in my duties to Nordson, I will never, either during my employment by Nordson or thereafter, use or disclose any Confidential Information as defined above. Upon termination of my employment with Nordson, all records of Confidential Information including copies thereof in my possession, whether prepared by me or others, will be left with Nordson.

\* \* \* \* \* \*

4. I promise that during my employment and for a period of two (2) years immediately following the termination of my employment with Nordson or for such part of the two (2) years as may be found lawful, I will not, either as principal, agent, consultant, employee, or otherwise, engage in any work involving any of the following:

a. Research, development or engineering relating to items similar to or competitive with the products I have been assigned to work on or the products I actually do work on at Nordson;

b. The promotion and/or sale of any similar product in direct competition with the line of Nordson which I have promoted and/or sold in the same territory or any part thereof during any part of the two-year period immediately preceding the termination of my employment with Nordson;

c. Situations in which the loyal fulfillment of my duties and responsibilities would inherently call upon me to reveal or otherwise to use proprietary or confidential information or trade secrets acquired while at Nordson and relating to Nordson activities.

If I am unable to obtain employment consistent with my abilities and education within one month after termination of my employment with Nordson, because of provisions of this paragraph, such provisions shall thereafter continue to bind me only as long as Nordson shall make payments to me equal to three fourths of my monthly base pay at termination [exclusive of extra compensation, bonus or employee benefits] for each month of such employment, commencing with the second month after termination of my employment with Nordson.

\* \* \* \* \* \*

5. It has been explained to me and I agree that because Nordson has various divisions throughout the country and the world, these obligations will be interpreted and construed in accordance with the laws of the State of Ohio so that everyone will be treated fairly should disputes ever arise.

Plasschaert became disenchanted with his prospects with Nordson and in late 1979 made plans to return to Europe to compete against Nordson. To this end he contacted Peter Dittberner, head of Dittberner, Gmbh, a German competitor of Nordson, in an effort to become a distributor of its hot-melt application equipment. No agreement was reached at that time. In February 1980 Plasschaert incorporated Ranier Corporation. In late April or early May 1980 he prepared the Ranier Plan, a document containing a variety of information on the hot-melt equipment market in general and on Nordson's business in particular. Plasschaert took the Ranier Plan to Europe in early May and showed at least two pages of it to Peter Dittberner during one of two meetings in which Plasschaert again sought to become a distributor for Dittberner's hot-melt equipment. Again no firm agreement was reached. During this trip Plasschaert obtained financing for his new business and arranged to move his family back to Europe.

Nordson found out about the Ranier Plan because, on this same trip to Europe, Plasschaert showed the plan to a fellow

Nordson employee who photocopied and gave it to his superiors who forwarded it to Nordson's management in Ohio. Plasschaert resigned May .12. Nordson filed suit May 14 against Plasschaert and Ranier Corporation alleging that they violated Nordson's common law protection of trade secrets, that Plasschaert breached the employee agreement with regard to disclosure of confidential information and the covenant not to compete, and that Plasschaert engaged in unfair competition with Nordson by his alleged attempt to solicit Nordson employees to join Ranier through use of the Ranier Plan.

The Georgia district judge analyzed this case with care and precision. He recognized that if he applied Georgia principles concerning covenants not to compete Plasschaert's covenant would be unenforceable because two of the subparagraphs contained no limitations on their territorial scope. However, Nordson and Plasschaert specified in paragraph 5 of the agreement that their obligations under the contract would be governed by Ohio law. The court found that under Georgia's conflict of laws rules Georgia would honor this choice by the parties of Ohio law as controlling. Then, applying the law of Ohio, which will enforce a covenant not to compete to the extent necessary to protect the employer's legitimate interests, the court declined to limit the injunction to only one line of hotmelt equipment, limited the geographical scope of the injunction to Western Europe, the United States and Canada (while refusing to limit it to only the United States as Plasschaert urged), and reformed the continued compensation provision upwardly to reflect the higher cost of living in Belgium, where Plasschaert intended to (and did) return. Also, the court upheld without modification a contract provision prohibiting the use or disclosure of confidential information as defined in the agreement.

Plasschaert challenges the district court's decision to apply Ohio law rather than Georgia law and also challenges the district court's enjoining him from selling all hotmelt equipment and from competing against Nordson in Western Europe. We affirm the district court.

## II.

■ Plasschaert asserts that despite the provision for governance by Ohio law the district court sitting in Georgia must as a matter of Georgia public policy apply Georgia law. As a federal court in a diversity case we must follow Georgia conflict of laws rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Absent the choice of law provision in the agreement Georgia courts would not enforce this covenant not to compete, *see, e.g., Puritan/Churchill Chemical Co.*, 245 Ga. 334, 265 S.E.2d 16 (1980); *Howard Schultz & Assoc. v. Broniec*, 239 Ga. 181, 236 S.E.2d 265 (1977). Even when the contract provides for a choice of law under which the covenant would be enforceable, Georgia may elect not to enforce it. *See, e.g., Dothan Aviation Corp. v. Miller*, 620 F.2d 504 (5th Cir. 1980); *Nasco, Inc. v. Gimbert*, 239 Ga. 675, 238 S.E.2d 368 (1977).

■ Though our analysis is somewhat different from that of the district court, we consider essentially the same factors that it examined, and we agree with the district judge that under the facts of this case a Georgia court would honor the parties' choice of law and apply Ohio law.

■ Like the Georgia Supreme Court in *Gimbert*, we look to the Restatement (Second) of Conflict of Laws § 187(2) (1971) to see if Georgia will honor the state law chosen by the parties:

(2) The law of the State chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen

state in the determination of the particular issue and which, under the rule of § 188 [Law Governing in Absence of Effective Choice by the Parties], would be the state of the applicable law in the absence of an effective choice of law by the parties.

Therefore, Georgia will honor the choice of law provision unless there was no reasonable basis for the parties' choice or unless the provision is "contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." Since Nordson is an Ohio corporation headquartered in Ohio, there is a reasonable basis for choosing Ohio law. The provision, however, is contrary to the fundamental Georgia policy against restraints of competition, see Ga. Code Ann. §§ 2–1409, 20–504. Thus the controlling determination is whether Georgia has a materially greater interest than Ohio in this issue.[2] We hold that it does not.

If the parties have not chosen the law of a state to govern their contract, a court deciding which state law applies must consider contacts with the relevant states, the parties' expectations, the policies of the individual states, and the basic policy underlying the field of law. *See, e.g.*, Restatement (Second) of Conflicts §§ 6(2), 188(2) (1971). If the parties have chosen an applicable law the court must balance these same factors, and the interests of another state must be materially greater than those of the chosen state to override the parties' choice of law. Each case must be analyzed on its own facts. There are no simple directives in a case as close as this one, where there are Georgia cases involving fundamental Georgia policy that apply Georgia law despite the parties' choice of law and other Georgia cases that apply a foreign law even though the parties did not choose a specific state law. *Compare Nasco, Inc. v. Gimbert*, 239 Ga. 675, 238 S.E.2d 368 (1977),

with *Commercial Credit Plan, Inc. v. Parker*, 152 Ga.App. 409, 263 S.E.2d 220 (1979).

The facts favor honoring the parties' choice of law. Nordson is an international corporation. Plasschaert worked for Nordson in the Netherlands, in Belgium, and in Georgia. Although Plasschaert signed the agreement in Georgia, his signing there, like the bringing of this suit there, was more "an accident of time and geography than through any reason giving rise to a substantial state interest in the litigation." *Nordson Corp. v. Plasschaert*, No. 80-7855, at 13 (N.D.Ga. Sept. 12, 1980). He had just arrived from Belgium. Most of the negotiations and preparation for the transfer were conducted while Plasschaert was still in Belgium. The agreement implies that Plasschaert might be transferred to different territories during his employment, and it states explicitly that Plasschaert would not compete in any territory in which he worked for Nordson during any part of the two-year period immediately preceding his termination. Thus, the place of performance of the covenant not to compete is Western Europe as well as Georgia. Moreover, both parties are primarily concerned with the agreement's effect in Western Europe because, although Plasschaert worked in Georgia for most of the last two years of his employment, he was already setting up his European business when he quit Nordson. Finally, Plasschaert's domicile, residence, and citizenship are more rooted in Western Europe than in Georgia. Plasschaert's contacts, therefore, are at least as closely related to Western Europe, particularly Belgium, as to Georgia.

Georgia emerges from this analysis as the state where Plasschaert and Nordson carried out a substantial part of the contract performance, but in the sequence of events leading up to the signing of the agreement and the relationship between

---

**2.** Not only must Georgia have a materially greater interest than Ohio in the controversy but also Georgia courts must choose Georgia as the state of applicable law if there is no effective choice of law by the parties. At least three European countries—Belgium, the Netherlands, and Germany—as well as Georgia and Ohio,

have an interest in this controversy. We assume without deciding that Georgia courts would have applied Georgia law if the parties had not stipulated that Ohio law would govern. The remaining issue, whether Georgia has a materially greater interest in this controversy than Ohio, controls our decision.

Nordson and Plasschaert after Plasschaert resigned, Georgia interests are all but nonexistent. Neither party expected Plasschaert to spend his career in Georgia, and he was expected to move as needed in the company's business. If Plasschaert had remained with Nordson, Ohio would have had continuing contacts regardless of where he worked. When the employment relationship ended Plasschaert almost immediately returned to Belgium to live in Brussels, the same city he left to come to Georgia.

Because each state (Georgia, Ohio, Belgium, and the Netherlands) has an interest in this dispute and because the employment relationship touched each of these states and to a large extent transcended political borders, no state has a "materially greater interest" in the controversy than any other state. Therefore, each state, including Georgia, should defer to the parties' choice of law if that choice has a reasonable basis, and this one does. Moreover, Georgia has even less of an interest in the controversy than its contacts suggest since the injunction would apply mainly to Plasschaert's activities in Western Europe, not in Georgia.

Despite the disperse contacts in this case a Georgia court still might refuse to enforce the provision under Ohio law if it finds it "*particularly* distasteful" to do so. *Commercial Credit Plan, Inc. v. Parker*, 152 Ga. App. 409, 263 S.E.2d 220, 223 (1979) (emphasis in original); *see also* Restatement (Second) of Conflicts § 6(2) (1971). The terms of this restriction are reasonable, however. Georgia's concern is that the restraint might cause undue injury to the employee or unreasonable injury to the public in general. *See Rakestraw v. Lanier*, 104 Ga. 188, 30 S.E. 735 (1898). The provision in paragraph 4c of the agreement for continued compensation equal to three fourths of Plasschaert's pay, especially as adjusted upwardly by the trial judge as permitted under Ohio law, *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975), alleviates any concern a court may have about his personal well being. Injury

to the Georgia public is minimal, if any, since Plasschaert intended to compete mainly in Europe. Moreover, both Georgia and Ohio favor the freedom of parties to contract, both states acknowledge an employer's right to safeguard his confidential information, and both recognize that in protecting its legitimate interests the employer must burden the employee as little as possible. *Compare Raimonde*, 325 N.E.2d at 546–47 (1975), *with Durham v. Stand-By Labor, Inc.*, 230 Ga. 558, 560, 198 S.E.2d 145, 148 (1973) *and Rakestraw v. Lanier*, 104 Ga. 188, 193, 30 S.E. 735, 738 (1898). *Cf. Commercial Credit Plan, Inc. v. Parker*, 152 Ga. App. 409, 263 S.E.2d 220 (1979). Thus, a Georgia court would not find it "particularly distasteful" to enforce the agreement.

### III.

Plasschaert also contends that there was insufficient evidence for the district court to enjoin him from the selling of all hotmelt equipment and from competing in the geographic areas [3] set forth in the court's order.

This is the district court's key paragraph relating to Nordson's two business units:

The court recognizes that Nordson has established two separate "strategic business units" within its Packaging and Assembly Division, and that separate sales forces market its products according to the intended application, at least within the United States. The fundamental issue, however, is whether this internal organization of Nordson so insulated Plasschaert that he was not exposed to confidential or proprietary information that might be useful to a competitor in the packaging market and that might injure Nordson's legitimate business interests. The evidence of record in this action will not support the conclusion that Plasschaert was so insulated. The record in this case is replete with examples of confidential data that Plasschaert had access to that involve aspects of Nordson's hot-melt business other than in

---

**3.** United States, Canada, United Kingdom, France, Netherlands, Luxembourg, Belgium, West Germany, Portugal, Spain, Italy, Greece, Denmark, Sweden, Finland and Norway.

the product assembly area. For example, Plasschaert was shown to have had access to technical and business or marketing plans for hot-melt equipment, including the long-range business plans for the entire world, cost data, market needs and opportunities, equipment applications, negative experience with experimental equipment, methods of manufacture and sources of materials, to state a few. For this reason, the court declines to limit the applicability of paragraph four to the product assembly market or to gear pump equipment.

The findings of fact in this paragraph are not clearly erroneous. *See* Fed. R.Civ.P. 52(a). Moreover, since under Ohio's reasonableness test, *Raimonde v. Van Vlerah, supra,* a trial judge exercises broad discretion in granting relief under the covenant, it was well within the judge's discretion to include all hot-melt equipment in his injunction.

The trial court also did not err in enjoining Plasschaert from competing in Western Europe as well as the United States and Canada. An employer wanting to protect confidential information is not necessarily compensated adequately by damages for injury caused by breach of confidence, so the employer may prefer a covenant not to compete to prevent the damage from occurring. In the abstract, most confidential information is worthy of protection without geographic limitation because once divulged the information or the fruits of the information quickly can pass to competitors anywhere in the world. *See* Blake, *Employee Agreements Not to Compete,* 73 Harv.L.Rev. 625, 667–84 (1960). As a practical matter, however, geographical limits often can be set. Ohio law permits a district court to expand or restrict the area affected to achieve a fair and equitable solution. *Raimonde, supra.* The trial court rejected both Nordson's request that the injunction be given worldwide scope and Plasschaert's request that the injunction be limited to the United States and issued the injunction to encompass Western Europe, Canada and the United States.

Limiting the countries as it did was a reasonable solution under the circumstances. The hot-melt adhesive market is a specialized, international market. Plasschaert was willing to use confidential information he acquired to further his European operations, and had already disclosed such information in his attempt to secure a distributorship and in his discussions with a fellow employee in Europe. There is ample evidence that Plasschaert assembled confidential information specifically to aid his future business in Europe. Under Ohio law as set out in *Raimonde,* 42 Ohio St.2d at 26, 325 N.E.2d at 548, the district court properly enjoined Plasschaert from competing against Nordson in Western Europe as well as in the United States and Canada.

AFFIRMED.