**James A. KEENER, Plaintiff,**

**v.**

**CONVERGYS CORPORATION,**
**Defendant.**

**No. 01–CV–182.**

United States District Court,
S.D. Georgia,
Savannah Division.

Feb. 20, 2002.

Wade Wilkes Herring, II, Colin A. McRae, Hunter, Maclean, Exley & Dunn, Savannah, GA, for James A. Keener, plaintiff.

Dana F. Braun, R. Krannert Riddle, Callaway, Braun, Riddle & Hughes, PC, Savannah, GA, Grant S. Cowan, Frost, Brown & Todd, LLC, Cincinnati, OH, for Convergys Corporation, defendant.

### ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

Insisting that his non-compete agreement (NCA) with defendant Convergys Corporation is unenforceably overbroad and violates public policy, plaintiff James A. Keener filed this action seeking injunctive relief against, and various damages from, Convergys. Doc. ## 1, 3. Keener is pursuing a judgment declaring the NCA unenforceable, preventing Convergys from enforcing it. Doc. # 1, Counts One & Two; doc. # 4.

Plaintiff also raises a tortious interference with contract claim and seeks O.C.G.A. § 13–6–11 attorney fees. Doc. # 1, Counts 3–4. Convergys counterclaims for an injunction enforcing the NCA's substance, if not restitution of the consideration paid to Keener, and for attorney fees/costs. Doc. # 11 at 6–12.

Following Keener's F.R.Civ.P. 65(b) notice, doc. # 5, the parties entered into a time-extension Consent Order and a confidentiality stipulation, doc. ## 9, 19, then undertook discovery. Doc. # 31 ¶ 5. Over Convergys's opposition, doc. # 29, Keener now moves for summary judgment. Doc. # 23.

## II. SUMMARY JUDGMENT STANDARDS

This Court applies the summary judgment principles explained in *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir.1996) and *Cohen v. United American Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir.1996). Unrebutted, evidentially supported Fact Statements are deemed admitted under S.D.GA.LOC. R. 56.1 and *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir.1988).

Thus, a party may not simply "deny" or "controvert" an opposing party's evidentially supported S.D.GA.LOC.R. 56.1 statement. *See, e.g., Tapley v. Collins,* 41 F.Supp.2d 1366, 1368 n. 1 (S.D.Ga.1999), *rev'd in part on other grounds,* 211 F.3d 1210, 1216 (11th Cir.2000). Instead, the nonmoving party must *rebut* the fact statement with evidence or show that it is not evidentially supported. Otherwise, the fact is established.

Therefore, where Convergys has failed to rebut Keener's factual statements by either (a) showing them to be evidentially unsupported; or (b) rebutting them with competent evidence, those facts will be established. This includes statements like Keener Fact Statement # 2—Convergys

has not rebutted it but simply points to other facts.

## III. *BACKGROUND*

Providers of wireless communications like wireless telephones use a computer-driven interface to provide their services. That requires constantly evolving computer hardware and software.[1] Companies like Convergys employ "knowledge workers" like Keener to construct and maintain such interfaces.[2]

The interface technology itself requires substantial resources to develop. Companies like Convergys point to that fact when competing for wireless providers' business.[3] Convergys, in fact, claims it is "the world's largest provider of integrated customer care and billing services." www.convergys.com/cc.html (site as of 2/20/02).

Knowledge of the interface technology naturally winds up in the minds of knowledge workers to whom competitors are naturally attracted. *See supra* note 2. Employers therefore employ trade-secret protection measures like NCAs to deter competitors. When an employee jumps to a competitor's ship, the original employer sometimes need only remind his competitor of the NCA to cause "jumper-termi-nation" under the implied if not actual threat of litigation.

That's essentially what happened here. Keener, while employed by a Convergys predecessor, signed a 1995 NCA which granted him stock options. Doc. # 29 exh. A; *see also* doc. # 26 ¶ 4. At that time, he worked first in an Ohio Convergys facility, but in 7/96 moved to an Illinois office to fill a "development management role" for a major Convergys client. Doc. # 35 at 31–32.

There, Convergys contends, Keener was "responsible for the development of enhancements and product support of a large volume customer care billing system. . . ." Doc. # 29 at 5. Keener says that in 1999 he followed an organizational split wherein he "took over [system] performance enhancements—that's like making the system run better, more efficient—and the architecture team, which is a lot of estimating." Doc. # 35 at 47.

Until Keener resigned in 2001, his work basically was "related to the software product . . . . [the] running of it, either changing the schedules or just some form of improvement of the overall performance." *Id.* at 48. He concedes he became privy to confidential, proprietary information after 2/95, *id.* at 45, so he ob-

---

1. Consider wireless communication provider H.O. Systems, Inc.'s web-site description of its

   core product, speedSUITE, [which is] a highly flexible, integrated, end-to-end billing and Customer Relationship Management service designed to assist wireless carriers by targeting and supporting each stage of the subscriber cycle from initiation through retention.

   www.hosystems.com/welcome/database/press asp?id=60 (site as of 2/20/02).

2. H.O. Systems, Inc., notes that its

   exponential growth has been supported by an influx of highly qualified employees from Georgia and beyond Active recruitment of specialized employees has been accom-plished through metropolitan newspapers, trade journals, placement services, and web-based organizations. This has proven to be highly successful with personnel doubling in the past year to the now nearly 300 employees.

   www.hosystems.com/welcome/company.htm (site as of 2/20/02).

3. Convergys claims to have invested

   nearly $100 million over the past three years [into its] component-based, next-generation framework[, which] supports the creation of billing and customer care solutions ranging from a single module to a complete, end-to-end product.

   www.convergys com/billing.html (site as of 2/20/02).

viously can be presumed to have retained at least some of it when he joined "H.O. Systems, Inc." (H.O.) in 2001. *See* doc. # 25 at 7–8. And, he concedes that Convergys was, as of 2/95, reaching a national market. Doc. # 35 at 40.

Keener disputes that H.O. is a "true" competitor of Convergys. Doc. # 25 at 6–7; # 35 at 143 ("They're [in] totally different leagues . . . ."). No material fact dispute exists on that score. H.O. is a competitor, just a very small one. *See* doc. # 35 at 144 ("I mean, you're talking single A versus Major Leagues here, and there's a big difference"); *id.* at 126–27 (Keener admits he signed an H.O. NCA that specifically references Convergys as its competitor, and that he understood that to mean if he left H.O. he could not go back to work for Convergys); doc. # 34 at 30, 47–48; www. hosystems.com/welcome/company. htm (site as of 2/20/02) ("H.O. Systems currently has client coverage in over 2/3rds of the United States and plans to not only encompass the entire country but to also spread internationally").

Keener disclosed Convergys's NCA to H.O. prior to joining it. Doc. # 35 at 93–94. He exercised his NCA-related stock options just prior to leaving Convergys. Doc. # 35 at 11112. Convergys contacted H.O. after it hired Keener. Doc. # 35 at 140–41. H.O. thereafter terminated Keener but paid him severance. *Id.* at 145–46. Keener continues to reside in Georgia, where he intends to remain if he prevails here. *Id.* at 149–50; *see also id.* at 149 ("Well, I could go back to H.O. potentially"). H.O., a Delaware-registered corporation, is located and transacts business in Savannah, Georgia. Doc. # 29 exh. B–C.

## IV. ANALYSIS

The NCA contains time, subject-matter and geographic restrictions, *see* doc. # 29 exh. A, all of which Keener argues are unenforceably overbroad under Georgia law. Doc. ## 25, 30. Convergys says the parties agreed that Ohio law applies and under it the NCA is enforceable. Doc. # 29 at 14, 22–25.

## A. Choice of Law

Ohio law applies, Convergys contends, because the NCA selects it. Doc. # 29 at 14. Pointing out that this Court is sitting in diversity, Convergys cites *Bryan v. Hall Chemical Company*, 993 F.2d 831, 834 (11th Cir.1993) and *Nordson Corp. v. Plasschaert*, 674 F.2d 1371 (11th Cir.1982), to support this result. Doc. # 29 at 14.

The NCA states that "[t]his Agreement shall be governed by the laws of the State of Ohio." Doc. # 29 exh. A at 3 ¶ 8. "Generally, Georgia will follow a forum selection clause in an employment contract. However, [the Convergys/Keener] contract involves not a forum selection clause, but a *choice of law selection clause* and requires a different legal analysis." *Hulcher Services, Inc. v. R.J. Corman R.R. Co., L.L.C.*, 247 Ga.App. 486, 489, 543 S.E.2d 461 (2000) (cite omitted; emphasis added).

■ That different analysis is applicable here: "Georgia conflicts of law will not follow a contractual selection of law of a foreign state where such chosen law would contravene the public policy of Georgia against certain unlawful covenants not to compete." *Id.* at 489, 543 S.E.2d 461. The burden is on Keener to show this. *Id.; Bryan*, 993 F.2d at 834.

The *Hulcher* employer sought, *inter alia*, to prevent its employee from working "in any capacity, either directly or indirectly, and from owning, managing, operating, controlling, being employed or connected with in any capacity" any similar business. 247 Ga.App. at 492, 543 S.E.2d 461. Because that was unreasonable, the court held the NCA there void as against Georgia's public policy. *Id.* at 493, 543 S.E.2d 461.

So, Georgia courts faced with this sort of case first apply Georgia law to determine whether an NCA violates Georgia's public policy. *Id; see also Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.,* 735 F.Supp. 1545, 1549 (M.D.Ga.1988) (Even where Georgia's conflict of laws rules dictate that law of sister state should apply, district court sitting in diversity should apply Georgia law where application of foreign law would result in decision that either was contrary to Georgia's public policy or was prejudicial to citizens of Georgia). Only if the NCA does not violate public policy will courts apply the contractually selected State law.

Convergys insists *Hulcher* does not apply because the ex-employer there sought to apply Texas law to an ex-employee who had never worked in Texas and, although the employment contract had been executed there, he had never performed on it in that State. Doc. # 29 at 21–22. And, Convergys points out, the ex-employee had been a Georgia resident the last time he'd worked for his ex-employer. *Id.; see also Hulcher,* 247 Ga.App. at 488–89, 543 S.E.2d 461. Here, in contrast, Convergys seeks application of Ohio law to an ex-employee who lived, worked and performed on the contract in Ohio at the time it was entered. And, Keener was not a Georgia resident the last time he worked for Convergys.

■ These are all valid points but they do not carry the day. First, for most of the contractual period (*i.e.,* mid–1996–2001), Keener performed on the *Ohio*-executed contract in *Illinois.* Second, it is undisputed that when Keener jumped ship to H.O., he became and remains a Georgia resident invoking, as is his undisputed right, the protection of Georgia law.

Third, Georgia law for some time has applied the public policy protections embodied in *Nasco, Inc. v. Gimbert,* 239 Ga. 675, 676, 238 S.E.2d 368 (1977), cited in

*Hulcher,* 247 Ga.App. at 489, 543 S.E.2d 461. In *Nasco,* the complaining ex-employer was a Tennessee corporation (though it had recently qualified to do business in Georgia). The *Nasco* contract indicated that the employee was a resident of Georgia when the contract was made and he was to perform it in Georgia. 239 Ga. at 675–76, 238 S.E.2d 368. And, the "plaintiff and the defendant had *agreed* that the contract would be construed pursuant to the law of Tennessee...." *Id.* at 676, 238 S.E.2d 368 (emphasis added). Nevertheless,

> the *Nasco* trial court applied the law of Georgia [and the Georgia Supreme Court found] no error. The law of the jurisdiction chosen by parties to a contract to govern their contractual rights will not be applied by Georgia courts where application of the chosen law would contravene the policy of, or would be prejudicial to the interests of, this state. Covenants against disclosure, like covenants against competition, affect the interests of this state, namely the flow of information needed for competition among businesses, and hence their validity is determined by the public policy of this state [*i.e.,* Georgia].

*Id.* at 676, 238 S.E.2d 368.

Keener was not a Georgia citizen when the instant contract was formed, and it was not to be performed in Georgia. But no distinguishing facts of that sort were illuminated in *Marketing and Research Counselors, Inc. v. Booth,* 601 F.Supp. 615 (N.D.Ga.1985), where the court focused on *Nasco*'s declaration that, notwithstanding what the parties may have contractually agreed, Georgia courts will not apply any contractual rights which "would contravene the policy of, or would be prejudicial to the interests of, [Georgia]." *Id.* at 616 (quoting *Nasco,* 239 Ga. at 676, 238 S.E.2d 368) (emphasis omitted); *see also Wolff v.*

appears at top right.

*Protege Systems,* 234 Ga.App. 251, 256, 506 S.E.2d 429 (1998), *disapproved on other grounds, Advance Technology Consultants, Inc. v. RoadTrac, LLC,* 250 Ga.App. 317, 320–21, 551 S.E.2d 735 (2001).

In *Booth,* the employee signed a non-solicitation/disclosure agreement (NSA) prohibiting him from soliciting, either directly or indirectly, his employer's clients. 601 F.Supp. at 615. The NSA specified that it had been made and delivered in the State of Texas and Texas law would apply. *Id.* The *Booth* court did not say where the employee lived or worked before and after entering the NSA. The court evidently did not consider those factors legally relevant, since it in essence applied only *Nasco's* "public-policy" doctrine when it invalidated the NSA (though not the non-disclosure agreement). *Id.* at 616–17.

This Court agrees with *Booth's* reasoning. Georgia's free-competition policy is embedded within its constitution and statutes.[4] Recent Georgia cases cited *supra* continue to vigorously apply *Nasco* to invalidate NCAs such as the agreement at issue here. This may wind up encouraging non-Georgia employees to "flee to Georgia" to shed their NCAs. The aches and pains of federalism (pro-marriage advocates in some States have decried other States' "quickie-divorce" laws), however, have long formed part of the American legal fabric.

*Nordson,* which applied Ohio law to uphold an NCA otherwise unenforceable under Georgia law, 674 F.2d at 1374, 1377, is factually distinguishable. *See id.* at 1376 ("When the employment relationship ended Plasschaert almost immediately returned to Belgium to live in Brussels, the same city he left to come to Georgia"); *id.* ("Moreover, Georgia has even less of an interest in the controversy than its contacts suggest since the injunction would apply mainly to Plasschaert's activities in Western Europe, not in Georgia"); *id.* ("Injury to the Georgia public is minimal, if any, since Plasschaert intended to compete mainly in Europe"); *id.* at 1375 ("[P]lasschaert's domicile, residence, and citizenship are more rooted in Western Europe than in Georgia. Plasschaert's contacts, therefore, are at least as closely related to Western Europe, particularly Belgium, as to Georgia").

On top of that, *Nordson's* reasoning itself is questionable. *See Booth,* 601 F.Supp. at 616–17 ("[t]he *Nordson* decision is in direct conflict with … *Nasco*") (emphasis omitted). The *Booth* court also pointed to conflicting, pre-*Nordson* precedent still binding then and now. *Id.* at 616 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham,* 658 F.2d 1098, 2000 n. 5 (5th Cir. Unit B 1981)) (court refused to apply contractually selected New York law in light of Georgia's public policy against such restrictive covenants) and *Barnes Group, Inc. v. Harper,* 653 F.2d 175, 178 n. 4 (5th Cir. Unit B 1981)

---

4. As one Georgia justice explained:

"It is a part of the public policy of this State to suppress monopolies and to encourage competition, and to this end restrictions on the right of any person, firm, or corporation to engage in its business and to do business with those members of the public who choose to partake of its services are not favored. [1983 Ga. Const, Art. III, Sec VI, Par. V; OCGA § 13–8–2]" (Emphasis supplied.) *Troup County Electric Membership Corp. v. Georgia Power Co.,* 229 Ga. 348, 351, 191 S.E.2d 33 (1972). *Shankman v. Coastal Psychiatric Assoc.,* 258 Ga. 294, 296 n. 2, 368 S.E.2d 753 (1988) (dissent); *see also* 1983 Ga. Const. Art. 3 § 6 ¶ V(c) ("The General Assembly shall not have the power to authorize any contract or agreement which may have the effect of or which is intended to have the effect of defeating or lessening competition, or encouraging a monopoly, which are hereby declared to be unlawful and void").

(same rationale in refusing to apply contractually selected Ohio law).[5]

While the ex-employees in *Stidham* and *Harper* evidently were Georgia residents working in Georgia when they entered into their respective contracts, neither of those courts cited those factors in applying *Nasco*. On balance, *Nasco*'s rationale applies here because Keener is, and would like to remain, a Georgia resident.

Finally, *Bryan,* which preceded later Georgia cases that have more vigorously applied *Nasco*'s public-policy doctrine, provides little support for Convergys—if only because the court there did not explore the issue in any detail. *See Bryan,* 993 F.2d at 834 ("Bryan fails, however, to address on appeal whether application of Ohio law will contravene Georgia fundamental policy. Moreover, the district court's finding that Georgia does not have a 'materially greater interest' than Ohio in the determination of this issue is not clearly erroneous. The only contact Georgia has with this case is that Bryan resides in Georgia").

Convergys insists that it "does not, in this action, seek to enforce the non-compete agreement signed by Plaintiff Keener." Doc. # 28 at 1. Count Two of its Counterclaim, however, says otherwise. *See* doc. # 11 at 7–12; *see also id.* ¶ 20 ("Unless restrained from working for H.O. Systems, Keener's employment with [it] will cause Convergys irreparable harm...."). Convergys is thus attempting to enforce its NCA in Georgia against a Georgia resident. Under Georgia law, its NCA therefore must be carried over Georgia's public policy threshold.

### B. "Blue Penciling"

██ If an employment-based NCA contains an overbroad restriction, the entire NCA will fail. *Advance,* 250 Ga.App. at 320, 551 S.E.2d 735 (In restrictive-covenant cases strictly scrutinized as employment contracts, Georgia does not employ the "blue pencil" doctrine of severability; an overbroad noncompete or nonsolicit covenant in a contract being strictly scrutinized automatically renders unenforceable other nonsolicit or noncompete covenants in the same agreement); *Morgan Stanley DW, Inc. v. Frisby,* 163 F.Supp.2d 1371, 1377–78 (N.D.Ga.2001) (Under Georgia law, a single unreasonable provision in restrictive covenant will void the entire contract, and courts will not "blue line" covenant to salvage any non-offending parts).

Under the instant NCA, Keener is barred from working for

> *any* business offering services related to the business of [Convergys] at the time of termination in *any* capacity which requires or utilizes the skill, training, or knowledge acquired by [Keener] while employed by [Convergys], whether such position would involve [Keener] in *any business activity in competition* with [Convergys] or in *any* business that provides billing and/or customer care systems to third parties engaged in the communications business (including wireless, wireline and cable communication businesses).

Doc. # 29 exh. A ¶ 2 (emphasis added). On its face this provision is overbroad. *See Ken's Stereo–Video Junction, Inc. v. Plotner,* 253 Ga.App. 811, 560 S.E.2d 708, 710 (2002) (invalidating NCA that included provision that employee "will not either directly or indirectly on his own behalf or as partner, officer, employee, shareholder,

---

**5.** All Unit B, Fifth Circuit opinions are binding on this Court. *See Stein v. Reynolds Secu-*  *rities, Inc.,* 667 F.2d 33 (11th Cir.1982).

or director of any person or entity, engage in or otherwise be interested in any business which consists of the sale and/or installation of consumer electronics (defined as audio, video, and car stereo) within twenty-five (25) miles of the store location of Employer at which Employee is employed at the time of termination"). To that end, Keener argues that it is unenforceable because:

(a) its territorial reach is overbroad, which renders the NCA unenforceable outright since it cannot be "blue-penciled," doc. # 25 at 11–12, 14–15;

(b) the scope of its employment restriction is overbroad (*i.e.*, it extends to Keener's employment with "any company anywhere in the world that provides billing services to the wireless industry, regardless of the software or hardware used to provide the services, and regardless of the other billing provider's target market," doc. # 25 at 12); and

(c) it contains no time limit. *Id.* at 15.

Convergys, of course, disagrees. Doc. # 29.

In that wireless telecommunications is a global business, Convergys must necessarily concede that its NCA geographically reaches nationwide, if not worldwide. *See* doc. # 26 ¶ 6 ("Convergys considers as a competitor any company anywhere in the United States, and for that matter, anywhere in the world, that provides billing services for wireless companies") (quotes and cite omitted).

■ Yet, therein lies the NCA's fatal flaw. If its geographic reach cannot be determined with reasonable certainty until the employee is terminated, it is unenforceable because Georgia courts "invalidat[e] territorial restrictions that change and expand during the course of the agreement." *New Atlanta Ear, Nose & Throat Associates, P.C. v. Pratt*, 253 Ga.App. 681, 560 S.E.2d 268, 273 (2002) (Covenant not to compete contained in employment contract, under which employee physicians agreed that in the event of the termination of employment they would not directly or indirectly practice medicine within a certain radius of a "prohibited office," was unenforceable, not because the list of two or three prohibited locations could be narrowed during the course of the agreement, but because the agreement failed to identify the addresses and number of offices in each location, thus allowing the circles of prohibited territory within each listed location to shift and expand during the course of the agreement, such that the territorial restriction could not be determined until the date of an employee's termination).

Convergys's NCA states: "This restriction will be limited to the geographical area where [Convergys] is doing business at the termination of employment or to such other geographical area such as a court shall find necessary to protect the goodwill and business of [Convergys]." Doc. # 29 exh. A. ¶ 2. Convergys does not dispute that its business reaches nationwide, if not "anywhere in the world." Doc. # 26 ¶ 6.

■ The NCA therefore is unenforceable because the scope of the restriction could not be known until termination, cannot be blue-penciled, and overreaches. *See Enron Capital v. Pokalsky*, 227 Ga. App. 727, 730, 490 S.E.2d 136 (1997) ("The non-competition provisions in this case were 'particularly distasteful' because they prohibited a former employee from competing anywhere in the world in any capacity. Such covenants have been held to be unenforceable in Georgia. Moreover, the non-competition restriction is unenforceable as geographically overbroad, since it prohibits Pokalsky from working in an area where Enron has done business in the past 12 months or anywhere it currently conducts business; 'area' is not defined") (cites omitted); *Capricorn Systems v. Pednekar*, 248 Ga.App. 424, 426, 546 S.E.2d

554 (2001) ("Where a former employee is prohibited from working in *any* scope or *capacity* of employment for a competitor of the former employer, such covenant not to compete is unenforceable as being overly and unreasonably broad") (emphasis added); *Plotner,* 253 Ga.App. 811, 560 S.E.2d 708, 710.

■ Similarly, the NCA's non-solicitation component, *see* doc # 29 exh. A ¶ 3 (barring contact for two years "with any person, firm, association, corporation or other entity"), is likewise unenforceable:

> The nonsolicitation of customers covered any and all customers of the plaintiff, regardless of whether defendant had ever worked for them or had any relationship established during employment anywhere. Therefore, such provision was void as overly broad and unreasonable in territory and in absence of relationships needing protection, because the relationships were developed during the employment. Further, such restrictive covenant had no definite geographic area limitations as to competition, solicitation of clients, or recruiting of employees, which also renders the covenant unenforceable for being overbroad.

*Capricorn,* 248 Ga.App. at 427, 546 S.E.2d 554 (cite omitted); *accord Advance,* 250 Ga.App. at 322, 551 S.E.2d 735 ("Thus ... a prohibition against doing business with any of an employer's customers, whether or not a relationship existed between the customer and the former employee, is overbroad in the absence of a reasonable territorial restriction") (quotes and cite omitted). The NCA therefore is unenforceable *in toto,* thus entitling Keener to declaratory and injunctive relief.

### C. Convergys's Counterclaim

Keener seeks complete summary judgment, including dismissal of defendant's counterclaim. Doc. # 25 at 16; # 30 at 4. Convergys has not raised any argument on its "restitution" counterclaim, doc. # 11 at

6 ("First Count"), something that was analogously reached in *Liautaud v. Liautaud,* 221 F.3d 981, 989 (7th Cir.2000) ("Illinois law does not allow a claim for unjust enrichment when the underlying contract has been held to be void as against public policy"), cited in 66 AM. JUR. 2D RESTITUTION AND IMPLIED CONTRACTS § 26 (*Effect Where Express Contract Is Invalid, Unenforceable, or Rescinded*) (2001).

Convergys's restitution claim is therefore abandoned. *Head Start Family Educ. Program, Inc. v. Cooperative Educ. Serv. Agency 11,* 46 F.3d 629, 635 (7th Cir.1995) ("This court has no duty to research and construct legal arguments available to a party").

### V. CONCLUSION

Plaintiff James A. Keener's motion for summary judgment (doc. # 23) against defendant Convergys Corporation is **GRANTED.** The parties' NCA, as described *supra,* is unenforceable. Keener's F.R.Civ.P. 65 Motion for a Preliminary Injunction against Convergys (doc. # 3), construed as a motion for permanent injunction, is **GRANTED.**

Accordingly, Convergys is permanently enjoined from enforcing the NCA against Keener in any court worldwide. This Order is binding on Convergys within the scope set forth in Rule 65(d)—hence, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

The parties' "Consent Motion and Memorandum for Protective Order" (doc. # 8) is **GRANTED.** Keener's Request for Oral Argument (doc. # 32) is **DENIED.** Plaintiff has not sought summary judgment on his remaining claims (*i.e.,* tortious interference with contract and O.C.G.A. § 13–6–11 attorney fees, doc. # 1, Counts 3–4),

though Convergys has just moved for same on "Count Three" (tortious interference with contract). Doc. # 42.

The parties therefore shall confer within ten days of the date this Order is served and attempt settlement, short of which plaintiff shall, within ten days thereafter, respond to defendant's summary judgment motion. In the event of settlement, Keener's counsel shall promptly present a consented-to final judgment closing this case.

Although the result reached here is required by Georgia law, it nevertheless presents an unfortunate clash between the core values enshrined in fundamental contract law [6] versus judicial and legislative choices governing the free flow of commerce. Restrictive covenants have been around for ages. They offer intellectual property owners protection against theft and dilution by others. They encourage investment and expand business opportunities. Society is served by the expansion of commerce and the prosperity it brings.

As noted, Keener admits he became privy to confidential information. But a fair reading of recent Georgia appellate decisions leads to the conclusion that employers within and without this State are, in many respects, powerless to protect business secrets. Judges are not endowed with business acumen, and a lot of the line drawing required in this field necessitates same. Whether and when a better line should be drawn in cases like this is perhaps best left to legislators, not judges.

---

6.  *See* U.S. Constitution Art. I, § 10, cl. I ("No State shall ... pass any ... Law impairing the Obligation of Contracts....").