In re Clinton Basil HUGHES, a.k.a., Hughes Timber Harvesting SSN: 252–78–1832, EIN: 58–188–4014, Debtor.

Orix Credit Alliance, Inc., Plaintiff,

v.

The CIT Group/Equipment Financing, Inc., and Associates Commercial Corporation, Defendants.

Bankruptcy No. 97–70390–JTL.
Adversary No. 97–7022–JTL.

United States Bankruptcy Court,
M.D. Georgia,
Valdosta Division.

Aug. 17, 1998.

Mark W. Roadarmel, Macon, GA, Assistant U.S. Trustee.

Christina A. Craddock, Bovis, Kyle & Burch, LLC, Atlanta, GA, Michael L. Hall, William C. Byrd, II, Burr & Forman, Birmingham, AL, for Plaintiff.

C. Edward Dobbs, Jack C. Basham, Jr., Parker, Hudson, Rainer & Dobbs, Atlanta, GA, for Defendant.

Walter W. Kelley, Albany, GA, Chapter 7 Trustee.

## MEMORANDUM OPINION

JOHN T. LANEY, III, Bankruptcy Judge.

On March 11, 1998 the court held a trial on the Complaint of Plaintiff, Orix Credit Alliance, Inc. ("Orix"), to determine the priority of liens between Orix and Defendants, The CIT Group/Equipment Financing, Inc.

("CIT") and Associates Commercial Corporation ("Associates") (collectively "Defendants"). The trial was continued to and concluded on March 13, 1998.

At the conclusion of the trial, the court took the matter under advisement and asked the parties to submit briefs. Upon consideration of the multiple briefs submitted by counsel, as well as the applicable statutory law and case law, the court, for reasons indicated below, finds that Orix's liens have priority over the liens held by CIT and Associates.

## FACTS

On April 14, 1997, Debtor, Clinton Basil Hughes ("Debtor" or "Hughes"), filed for relief under Chapter 11 of the Bankruptcy Code ("Code").[1] Prior to filing bankruptcy, Debtor entered into a number of transactions to obtain equipment to use in his business. Debtor entered into multiple transactions with Orix, CIT, and Associates. On July 30, 1997, Orix filed this adversary proceeding for the court to determine the priority of liens between Orix, CIT, and Associates. The court will now outline each of the relevant transactions Debtor entered into with Orix, CIT, and Associates.

### Orix Transactions

On April 30, 1990, Debtor entered into a Security Agreement–Mortgage on Goods and Chattels with Orix ("Orix 1"). In Orix 1, Debtor granted to Orix a security interest in a Hanover Prehauler, as well as:

> all other goods, chattels, machinery, equipment, inventory, accounts, chattel paper, notes receivable, accounts receivable, furniture, fixtures, general intangibles and property of every kind and nature, wherever located, now or hereafter belonging to [Debtor] and all proceeds and any distribution thereof and any insurance thereon. . . .

*Paragraph 1, Orix Exhibit 001.* On May 2, 1990, Orix filed UCC–1 financing statements covering, among other things, "all machinery, inventory, equipment and accounts receiv-

able" of Debtor. Orix filed the UCC–1 statements in Lowndes County and Brooks County, Georgia. On February 27, 1995, Orix filed UCC–3 continuation statements for the May 2, 1990 UCC–1 statements.

On November 13, 1990, Debtor entered into a second Security Agreement–Mortgage on Goods and Chattels with Orix ("Orix 2"). In Orix 2, Debtor pledged two Hanover Prehaulers as collateral, as well as the identical pledge of security as found in paragraph 1 of Orix 1. On November 15, 1990, Orix filed UCC–1 financing statements covering, again, "all machinery, inventory, equipment and accounts receivable" of Debtor. Orix filed the financing statements in Lowndes County and Echols County, Georgia. On October 19 and 25, 1995, Orix filed UCC–3 continuation statements for the November 15, 1990 UCC–1 statements.

On April 4, 1996, Debtor entered into a Conditional Sale Contract ("CSC") with C.A. Credit Corporation ("C.A. Credit") for the purchase of a Timberjack Skidder model 450C ("Orix 3"). This CSC was subsequently assigned to Orix. In Orix 3, Debtor granted the holder a security interest in, among other things, all equipment, "which [Debtor] now or hereafter has any right or interest." On April 17, 1996, Orix filed a UCC–1 financing statement covering, among other things, all equipment.

On September 3, 1996, Debtor entered into a CSC with the Carlton Company ("Carlton") for the purchase of a Barko Fellerbuncher ("Orix 4"). Carlton subsequently assigned the CSC to Orix. As with Orix 3, Orix 4 granted the holder a security interest in, among other things, all equipment, "which [Debtor] now or hereafter has any right or interest." On September 9, 1996, Orix filed a UCC–1 financing statement covering, among other things, all equipment.

Between the transactions with Orix in 1990 and 1996, Debtor entered into a number of transactions with both Associates and CIT. Specifically relevant to this adversary proceeding are six transactions with Associates and three transactions with CIT.[2]

---

1. The case was converted to Chapter 7 on July 30, 1998.

2. Appendix A to this Memorandum Opinion contains a chart summarizing the six transactions

*Associates Transactions*

On January 14, 1994, Debtor entered into a Security Agreement/Conditional Sale Contract with Reid, Inc., which was subsequently assigned to Associates. The court will refer to this agreement and transaction as "Associates 1." In Associates 1, Debtor purchased a Prentice Model 210D Log Loader, serial number ("S/N") 51103, equipped with John Deere 6059T Power Unit S/N: 408321, CX762 Grapple, S/N: A40957, 60 inch Jackson Circle Saw, S/N: J60S–1594, 37 foot Big John Loader Trailer, S/N: 1B9MC4024PFBJ0617. On January 18, 1994, Associates filed a UCC–1 financing statement covering the equipment listed in Associates 1.[3]

On July 22, 1994, Debtor entered into a Security Agreement/Conditional Sale Contract with Reliable Tractor Company, which was subsequently assigned to Associates. The court will refer to this agreement and transaction as "Associates 2." In Associates 2, Debtor purchased a John Deere Model 648E Skidder, S/N: DW648ES545868. A representative from Reliable Tractor testified that the equipment in Associates 2 was delivered to Debtor on July 22, 1994.[4] On July 28, 1994, Associates filed a UCC–1 financing statement covering the equipment listed in Associates 2. However, the UCC–1 also covered two additional pieces of collateral. Specifically, the UCC–1 also listed the Prentice Model 210D Log Loader, S/N:

51103, equipped with John Deere 6059T Power Unit S/N: 408321, CX762 Grapple, S/N: A40957, 60 inch Jackson Circle Saw, S/N: J60S–1594, 37 foot Big John Loader Trailer, S/N: 1B9MC4024PFBJ0617;[5] and a Franklin Model HTFB 300 Fellerbuncher, S/N: 15510.

On May 3, 1995, Debtor entered into a Security Agreement/Conditional Sale Contract with Reliable Tractor, Inc., which was subsequently assigned to Associates.[6] The court will refer to this agreement and transaction as "Associates 3." In Associates 3, Debtor purchased a John Deere Model 648G Grapple Skidder, S/N: DW648GS550849. A representative from Reliable Tractor testified that the equipment in Associates 3 was delivered to Debtor on May 2, 1995.[7] On May 9, 1995, Associates filed a UCC–1 financing statement covering the equipment listed in Associates 3.

On May 25, 1995, Debtor entered into a Security Agreement/Conditional Sale Contract with Tidewater Companies, Inc. ("Tidewater"), which was subsequently assigned to Associates. The court will refer to this agreement and transaction as "Associates 4." In Associates 4, Debtor purchased a Tigercat 720 Fellerbuncher, S/N: 7201140, and a Koehring 20 inch Saw Head, S/N: 63661. A representative from Tidewater testified that the equipment in Associates 4 was delivered on May 24, 1995.[8] On May 30, 1995, Associ-

---

with Associates. Moreover, Appendix B contains a chart summarizing the three transactions with CIT.

**3.** At trial, Orix stipulated that it was not seeking any type of relief with respect to the equipment in Associates 1. The equipment had previously been destroyed and Associates, not Orix, was listed on the insurance contract. As a result, the insurance proceeds were paid to Associates, but Orix is not seeking the proceeds.

**4.** Debtor's testimony conflicted with the testimony of the Reliable Tractor representative. Debtor testified that he often would try out the equipment and usually received the equipment a few days to a week before he would sign the contracts with Reliable Tractor. Debtor, however, could not pinpoint a specific date on which he received the equipment. As the court will discuss later, the court considers the date on which a debtor "receives possession" within the meaning of O.C.G.A. § 11–9–312(4) as "the time of the decision to buy, rather than at the time that

technical possession of the goods was taken." *United States v. Hooks (In re Hooks),* 40 B.R. 715, 721 (Bankr.M.D.Ga.1984). Accordingly, because Debtor did not decide to purchase the equipment until he signed the contract, the court need not resolve the discrepancy in the testimony.

**5.** This is the equipment sold in Associates 1.

**6.** The court notes that this agreement was entered into with Reliable Tractor, Inc., while Associates 2 was entered into with Reliable Tractor Company. It appears, however, that these two entities are in fact the same. William Larry Walker, a representative from Reliable Tractor, Inc., testified as to both transactions.

**7.** *See* note 3, *supra.*

**8.** As with the testimony of the Reliable Tractor representative, Debtor's testimony also conflicted with that of the Tidewater representative. But as stated in footnote 3, *supra,* it is not necessary for the court to resolve the discrepancy.

ates filed a UCC–1 financing statement covering the equipment listed in Associates 4.

On July 24, 1996, Debtor entered into a Security Agreement/Conditional Sale Contract with Tidewater, which was subsequently assigned to Associates. The court will refer to this agreement and transaction as "Associates 5." In Associates 5, Debtor purchased a Tigercat Fellerbuncher Model 845, S/N: 8450111. A representative from Tidewater testified that the equipment in Associates 5 was delivered to Debtor on July 22, 1994. On August 1, 1996, Associates filed a UCC–1 financing statement covering the equipment listed in Associates 5.

On March 11, 1997, Debtor entered a Security Agreement/Conditional Sale Contract with Tidewater, which was subsequently assigned to Associates. The court will refer to this agreement and transaction as "Associates 6." In Associates 6, Debtor purchased a Koehring 20 inch Saw ("Koehring Saw"), S/N: 960277. Debtor initially obtained possession of the Koehring Saw when he purchased the Fellerbuncher in Associates 4. Debtor testified, however, that he did not intend to keep the Koehring Saw, but was only using it until the saw that he wanted to purchase was available from Tidewater. Nevertheless, Debtor subsequently decided to keep the Koehring Saw. At that point, Debtor entered into the Security Agreement/Conditional Sale Contract for the purchase of the Koehring Saw. On March 17, 1997, Associates filed a UCC–1 financing statement covering the equipment listed in Associates 6. However, the UCC–1 also covered a Tigercat 845 Fellerbuncher, S/N: 845011.[9]

All six agreements with Associates contain a cross security clause. Specifically, the agreements provide:

CROSS SECURITY. Buyer grants to Seller a security interest in the Collateral to secure the payment of all absolute and all contingent obligations and liabilities of Buyer to Seller, to any assignee of Seller, now existing or hereafter arising, whether under this agreement or any other agreement and whether due directly or by assignment; provided, however, upon any assignment of this Agreement by Seller, the assignee shall be deemed for the purpose of this paragraph as the only party with a security interest in the Collateral.

Additionally, the court notes that on July 22, 1994 and July 24, 1996, Debtor entered into separate "Cross Collateral/Cross Default" agreements with Associates. These agreements provide, in relevant part, that:

In order to induce [Associates] to extend [Debtor's] time of payment on one or more Accounts and/or to make additional loans to [Debtor] and/or to lease Collateral to [Debtor] and/or to purchase additional Accounts, and in consideration of [Associates] so doing, and for other good and valuable consideration, the receipt of which [Debtor] hereby acknowledge[s], [Debtor] agree[s] as follows:

All presently existing and hereafter acquired Collateral ... in which [Associates] shall have a security interest shall secure the payment and performance of all of [Debtor's] liabilities and obligations to [Associates] of every kind and character, whether joint or several, direct or indirect, absolute or contingent, due or to become due, and whether under presently existing or hereafter created Accounts or agreements, or otherwise (herein individually and collectively designated "Obligations").

[Debtor] further agree[s] that [Associates'] security interest in the Collateral covered by any Account now held or hereafter acquired by [Associates] shall not be terminated in whole or in part until and unless all of [Debtor's] obligations to [Associates] are fully paid and satisfied and the terms of every Account now owned or hereafter acquired by [Associates] have been fully performed by [Debtor]. It is

---

**9.** The court finds that this is the same Tigercat 845 Fellerbuncher in Associates 5. The court notes, however, that the serial number given on the UCC–1 in Associates 6 appears to have a typographical error. Specifically, the serial number listed in Associates 5 for the Fellerbuncher is 8450111. However, the serial number listed in Associates 6 for the same Fellerbuncher is 845011. The court notes, the Fellerbuncher listed on this UCC–1 is not the same Fellerbuncher that the Koehring Saw came with. As noted above, the Koehring Saw came with the equipment in Associates 4, not Associates 5.

further agreed that [Associates is] to retain [its] security interest in all Collateral covered by all Accounts now owned or hereafter acquired by [Associates], as security for payment and performance under each such Account, notwithstanding the fact that one or more of such Accounts may become fully paid.

Finally, the court notes that in April 1996 and February 1997, Debtor and Associates entered into various modification agreements. These modification agreements modified Debtor's payment obligations to enable Debtor to cure any delinquencies on his accounts. Specifically, in April 1996, Associates 1, 2, and 4 were modified. In February 1997, Associates 2, 3, and 5 were modified.[10]

### CIT Transactions

On May 4, 1995, Debtor entered into a security agreement with CIT for the purchase of a Timberjack Model 450C Grapple Skidder, S/N: CE4369. The court will refer to this agreement and transaction as "CIT 1." On May 17, 1995, CIT filed a UCC–1 financing statement covering the equipment listed in CIT 1. The parties stipulated that CIT filed the UCC–1 statement within fifteen days of the date Debtor received the equipment.

Also on May 4, 1995, Debtor entered into a second security agreement with CIT. This security agreement was for the purchase of a Hood Model 20000 Log Loader, S/N: 204839, a Jackson Self–Propelled Carrier, S/N: JSPC–4X–595–20H, and a Jackson 60 inch Slasher Saw, S/N: JS60–5595. The court will refer to this agreement and transaction as "CIT 2." On May 11, 1995, CIT filed a UCC–1 financing statement covering the equipment listed in CIT 2. As with CIT 1, the parties stipulated that CIT filed the UCC–1 statement for CIT 2 within fifteen days of the date Debtor received the equipment.

On September 30, 1995, Debtor entered into a security agreement with Pioneer Machinery, Inc. ("Pioneer") for the purchase of a Timberline Stroke Delimber Model 3510A, S/N: C500–080T. The same day, Pioneer assigned this agreement to CIT. The court will refer to this agreement and transaction as "CIT 3." On October 23, 1995, CIT filed a UCC–1 financing statement covering the equipment listed in CIT 3. The parties stipulated that CIT *did not* file the UCC–1 statement for CIT 3 within fifteen days of the date Debtor received the equipment.

All three of the security agreements Debtor entered into with CIT contain a cross security provision. Specifically, the agreements provide:

> Each Item of the Collateral shall secure not only the specific amount which Debtor promises to pay in Paragraph 3 below, but also all other present and future indebtedness or obligations of Debtor to Secured Party of every kind and nature whatsoever.

### Contentions

The court will now generally outline the contentions of both Orix and Defendants. Orix contends that it holds a valid security interest in all of Debtor's equipment in question in this adversary proceeding. Moreover, Orix claims that its security interests are paramount to any security interest held by either Defendant.

Orix makes two claims with respect to the security interests held by Defendants. Firstly, Orix contends that Associates and CIT do not hold properly perfected purchase money security interests ("PMSI"). Orix asserts, except for CIT 1 and CIT 2, that Defendants did not perfect the purported PMSIs within the time required by Georgia law and therefore do not have properly perfected PMSIs. Secondly, Orix contends that even assuming Defendants perfected the PMSIs in a timely manner, that by virtue of the transformation rule Defendants converted the PMSIs into normal security interests. Either way, Orix contends that Defendants' security interests are junior to Orix's security interests.

Both Defendants, however, contend that the purported PMSIs were perfected in a

---

10. Apparently, Associates 2 was modified twice.

timely manner.[11] Furthermore, Defendants dispute that the transformation rule would transform the PMSIs into normal non purchase money security interests. Additionally, Defendants assert that the notes and security agreements in which Orix bases its senior security interest are unenforceable.[12] Therefore, Defendants assert that their security interests have first priority regardless of whether any PMSI was transformed into a non PMSI. Finally, Defendants contend that Orix has not properly proven its claim.

## DISCUSSION

The parties agree that Georgia law applies with respect to determining the priority of the security interests. Section 11–9–312 of Official Code of Georgia Annotated ("O.C.G.A.") addresses "Priorities among conflicting security interests in the same collateral." Generally, "Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier...." O.C.G.A. § 11–9–312(5).

This general rule, however, does not apply to creditors who have a properly perfected PMSI. Section 11–9–107 provides that a security interest is a PMSI to the extent it is "(1) Taken or retained by the seller of the collateral to secure all or part of its price; or (2) Taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral...." O.C.G.A. § 11–9–107. Moreover, § 11–9–312(4) provides that "A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 15 days thereafter." O.C.G.A. § 11–9–312(4).

As a result, assuming Orix has properly perfected first in time security interests, Orix

would have priority over any subsequent security interest taken in the same collateral, unless the subsequent security interest is a properly perfected PMSI. Therefore, Defendants would prevail if Defendants have properly perfected PMSIs and have done nothing to transform these PMSIs into normal security interests.

The court will first address whether Defendants have properly perfected PMSIs. Next, assuming that Defendants have properly perfected PMSIs, the court will address whether the transformation rule would apply to transform the PMSIs into normal security interests. Finally, the court will address the enforceability of Orix's security interests and whether Orix has properly proven the amount of its claim.

### Defendants Properly Perfected the PMSIs

With respect to whether Associates has properly perfected the PMSIs, Orix contends that Associates did not perfect its purchase money status by filing a UCC–1 financing statement within fifteen days of Debtor receiving possession of the collateral as required by O.C.G.A. § 11–9–312(4). It is undisputed that each of Associates' UCC–1 financing statements was filed within fifteen days of the date Debtor signed the security agreements.

The dispute centers around the term "receives possession" in § 11–9–312(4). Orix contends that the term "receives possession" means physical possession. Moreover, Orix asserts that Debtor generally received the equipment anywhere from two to three weeks before he signed a security agreement. Orix concludes that because Associates cannot prove the exact day Debtor received physical possession of the equipment, it cannot prove that it filed the UCC–1 financing statements within fifteen days as required by Georgia law.

Associates, however, argues that the term "receives possession" actually refers to the date "a debtor" receives possession. More-

---

11. Except for CIT 3, which both CIT and Orix stipulated that the financing statement was not filed in a timely manner to perfect purchase money status.

12. Defendants make several different arguments with respect to the enforceability of Orix's notes and security interests. The court will discuss these arguments in greater detail *infra*.

over, Associates contends that someone cannot receive possession until that someone is a debtor. For example, Associates argues that Mr. Hughes could not receive possession within the meaning of § 11–9–312(4) until he became obligated to purchase the equipment.

In *United States v. Hooks (In re Hooks)*, 40 B.R. 715 (Bankr.M.D.Ga.1984), the court faced a similar issue.[13] In *In re Hooks*, a farmer took physical possession of some cows. The farmer wanted to care for the cows to determine whether he would purchase them. Several weeks later the farmer decided to purchase the cows. At that time, he signed a security agreement and note with a credit association. The credit association then filed a UCC–1 financing statement within 15 days. The Farmers Home Administration ("FmHA"), however, had a prior lien on the farmer's cows. The FmHA claimed that the credit association had not perfected within fifteen days from the date the farmer received possession and therefore did not have purchase money status. Thus, FmHA concluded its lien was superior to the credit association's.

The court determined that the credit association had filed its UCC–1 financing statements within the required fifteen days. *Id.* at 721. The court stated that is was following the majority of courts and concluded that for the purposes of § 11–9–312(4) a buyer takes possession at the time of the decision to buy, not at the time of technical physical possession if physical possession had been obtained earlier. *Id.* The court found that the farmer did not decide to purchase the cows until he signed the security agreement. At that time the farmer became a debtor, and the credit association's fifteen days to file its UCC–1 statement began. Accordingly, because the credit association had filed its UCC–1 statement within fifteen days of the date the debtor signed the security agreement, the court found that the credit association had timely perfected its PMSI. *Id.*

■ The court agrees with Associates and the holding in *In re Hooks*. Debtor testified that he typically received the equipment a few weeks before he would sign a security

agreement. Debtor testified that he would "try out" the equipment. Debtor's testimony, however, conflicted with the testimony of the representatives from the dealerships where Debtor purchased the Associates equipment. The dealership representatives both testified that the security agreements were signed within a day of delivery to Debtor.

The court need not resolve this conflict in the testimony. Viewed either way, Associates has timely perfected its PMSI. Assuming the facts are as stated by Debtor, Debtor did not become obligated to purchase the equipment until he signed a security agreement, at which time he became a debtor within the meaning of § 11–9–312(4). For each piece of equipment, Associates filed its UCC–1 financing statements within fifteen days of the time Debtor entered into the security agreements. As a result, Associates has timely perfected PMSIs.

As for the CIT agreements, the parties stipulated that with respect to CIT 1 and CIT 2, CIT filed the UCC–1 financing statements within the required fifteen days. Therefore, CIT has a properly perfected PMSI in CIT 1 and CIT 2. However, the parties stipulated that CIT did not file the UCC–1 financing statement within the required fifteen days for CIT 3. As a result, CIT does not have a properly perfected PMSI in CIT 3.

### The Transformation Rule

■ The court will now address whether the transformation rule applies to transform Defendants' PMSIs into normal non PMSIs. The transformation rule holds that a secured party cannot have its cake and eat it too. If a party creates a valid purchase money security interest in property it has loaned money for the debtor to buy, it can "spoil" that PMSI by extending the security interest to other property of the debtor for which it did not provide purchase money.

*Amsouth Bank, N.A. v. Orix Credit Alliance, Inc. (In re Delta Resources, Inc.)*, 162 B.R. 562, 567 (Bankr.N.D.Ala.1993). Orix primar-

---

**13.** *In re Hooks* was decided by Judge Hershner, now the Chief Bankruptcy Judge for this district.

ily relies upon two decisions from the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") to support its position.

The first case Orix relies upon is *Southtrust Bank of Alabama v. Borg–Warner Acceptance Corp.*, 760 F.2d 1240 (11th Cir. 1985). In *Southtrust*, Southtrust Bank ("Bank") and Borg–Warner Acceptance Corporation ("BWAC") each had perfected security interests in the inventory of the debtors. BWAC claimed to have a PMSI and therefore contended that its lien was superior to the Bank's. The Bank, however, contended that BWAC's PMSI had been transformed into a normal security interest thereby giving the Bank a superior first in time lien. The court couched the issue as "whether inclusion of an after-acquired property clause and a future advances clause in BWAC's security agreements converted its purchase money security interest (PMSI) into an ordinary security interest." *Id.* at 1242.

The district court, relying on *In re Manuel*, 507 F.2d 990 (5th Cir.1975), held that the inclusion of the after-acquired property and future advances clauses converted the security agreement into an ordinary security interest. The Eleventh Circuit affirmed. The court held that the exercise of future advances and after-acquired clauses destroys PMSI status, thereby converting the security interest into an ordinary security interest. 760 F.2d at 1243. The court found that BWAC had exercised the clauses. As a result, the court specifically did not decide whether the mere inclusion of unexercised future advances and after-acquired property clauses would destroy the PMSI. *Id.*

BWAC argued that even if such a clause was exercised, it would not destroy a PMSI as long as there is some way of determining the extent of the PMSI. This could be accomplished, BWAC argued, by providing some method for allocating payments to particular items. The court, however, found nothing in the security agreement or state law that would allocate payments to particular items of inventory. The court stated, quoting *Coomer v. Barclays American Financial, Inc. (In re Coomer)*, 8 B.R. 351, 355 (Bankr.M.D.Tenn.1980), that " 'without some

guidelines, legislative or contractual, the court should not be required to distill from a mass of transactions the extent to which a security interest is purchase money.' " 760 F.2d at 1243. The court went on to say that "[u]nless a lender contractually provides some method for determining the extent to which each item of collateral secures its purchase money, it effectively gives up its purchase money status." *Id.*

The second case Orix relies upon is *Snap-On Tools, Inc. v. Freeman (In re Freeman)*, 956 F.2d 252 (11th Cir.1992). In *Freeman*, a chapter 7 debtor moved to avoid a lien held by Snap-On Tools, Inc. ("Snap On") in tools he used in his business. The debtor contended the lien was a non purchase money non possessory lien that could be avoided pursuant to § 522(f) of the Code. The creditor, however, disagreed and contended that it held a PMSI in the tools.

The debtor had first purchased tools from a Snap-On dealer in June 1987 on a revolving account. In February 1988, the debtor purchased more tools from the dealer. Snap-On financed the purchase of the new tools and entered into a credit agreement with the debtor. The credit agreement included as security the new tools in addition to the tools from the revolving account, which the dealer had assigned to Snap-On. *Id.* at 253.

The debtor continued to purchase tools from the dealer on the revolving account. The debtor made weekly payments to the dealer. The dealer would apply the payments first to pay the monthly payment on the credit agreement with Snap-On. The dealer applied the remainder of the debtor's payments to the balance of the revolving account. *Id.*

In July 1988, the debtor purchased more tools and entered into a second financing agreement with Snap-On. Snap-On retained as security the new tools as well as the collateral of the first agreement and the revolving account. On November 1, 1988 the debtor entered into a third agreement with Snap-On. This agreement brought forward both the balances and the tools from the previous two agreements. On November 18,

1988 Snap–On filed a UCC–1 financing statement. *Id.*

The bankruptcy court found that Snap–On had lost its PMSI when it consolidated the debts. The bankruptcy court concluded that Snap–On's "first in/first out" was inadequate to determine which tools had been paid for and which tools had not. The district court affirmed. *Id.*

The Eleventh Circuit affirmed the district court. The court found that to enforce a PMSI that consolidates debts a "lender must provide some method 'for determining the extent to which each item of collateral secures its purchase money.'" *Id.* at 255 (quoting *Southtrust,* 760 F.2d at 1243). Moreover, the court found that Snap–On's allocation method was defective. The court stated:

> This method provides no allocation among sales tax, interest, and purchase price although Snap–On must have intended to be paid for all three items. Because the method for allocating the payments made by Freeman is inadequate to determine which tools have been paid for and which secure their own purchase price, Snap–On's security interest does not survive the consolidation of debts.

*Freeman,* 956 F.2d at 255.

Orix argues based upon this Eleventh Circuit authority that both Associates and CIT have transformed the PMSIs into ordinary security interests by exercising the cross-security clauses. Moreover, Orix contends that the contracts in question do not provide for any allocation method for applying specific payments to specific pieces of collateral.

Defendants contend that they have not exercised the cross-security clauses. Therefore, Defendants conclude, the cases cited by Orix do not apply. Defendants point out that the Eleventh Circuit has specifically not decided whether an unexercised cross security clause would destroy purchase money status. *See Southtrust,* 760 F.2d at 1243. Defendants argue, however, that even if the court finds the cross-security clauses have been exercised, it can easily be determined which payments were applied to specific pieces of collateral. As a result, Defendants assert that the PMSIs were not transformed.

The court finds *In re Delta Resources, Inc., supra,* to be instructive. In *Delta Resources,* the court had to determine whether a creditor's PMSI had been transformed into an ordinary security interest. The court first concluded that "[f]or whatever the arguments against the transformation rule, it is clearly the law in the Eleventh Circuit." 162 B.R. at 570.[14] The court found that the purchase money creditor had exercised the cross-security clauses in its security agreements. *Id.* at 570. The court placed particular importance on, among other things, the fact that the creditor had filed a motion for relief from stay wherein the creditor cited collateral in addition to the purchase money collateral. *Id.* at 571. As a result, the court concluded that the creditor had lost its purchase money status.

■ With respect to Associates, the court finds that it has exercised the cross-security clauses in its security agreements. Firstly, when Associates filed two of its UCC–1 statements for the collateral for which it provided purchase money financing, Associates not only included the collateral for that particular agreement, but also included collateral from earlier agreements. For example, in Associates 2, Debtor purchased a John Deere Skidder. However, Associates' UCC–1 purports to have as security the Skidder as well as the collateral in Associates 1. Moreover, the UCC–1 for Associates 6 not only lists the collateral purchased in Associates 6, but also a piece of equipment purchased in Associates 5. The court finds this is a clear exercise of the cross-security clauses.

Secondly, the court finds the July 22, 1994 and July 24, 1996 "Cross Collateral/Cross Default" agreements are evidence of Associ-

14. Just as the purchase money creditor in *Delta Resources,* Defendants have also made arguments to the effect that the transformation rule should not be the law. The court in *Delta Resources* stated that the purchase money creditor's "argument about what the law should be may well have some merit. If this bankruptcy court were writing on a clean slate, on a question of first impression, it might well reject the transformation rule." 162 B.R. at 568. This court agrees. However, this court is bound by Eleventh Circuit authority interpreting Georgia law.

ates' attempt to expand its security beyond the collateral in each security agreement. These agreements very clearly extend Associates' collateral beyond any individual loan. These agreements provide that Associates retains its "security interest in all Collateral covered by all Accounts now owned or hereafter acquired by [Associates], as security for payment and performance under each such Account, notwithstanding the fact that one or more or such Accounts may become fully paid."

The court also finds that CIT has exercised the cross-security provisions in its security agreements. On July 17, 1997 CIT filed a motion for relief from the automatic stay. In its motion, CIT delineates each transaction it had entered into with Debtor. Each time CIT describes the security for a particular security agreement, it says that the equipment for that particular transaction secures any and all obligations owed to CIT. For example, when describing the transaction and security for CIT 3, the motion states: "Pursuant to the Delimber Security Agreement, and to secure any and all obligations and indebtedness of the Debtor to Pioneer, the Debtor granted to Pioneer a security interest in and to the Delimber." [15] ¶ 8 CIT Motion for Relief from Stay. The court finds this is sufficient evidence of CIT's intent to exercise its cross-security provisions.

Because the court finds that Defendants have exercised the cross-security provisions, the court need not address whether an unexercised cross-security provision in a contract would transform a PMSI into a normal security interest.

The effect of having exercised the cross-security provisions is that both Defendants' PMSIs are transformed into ordinary security interests, unless there is a contractually provided allocation method. Defendants argue that because of the way the accounts were set up internally, a balance for each piece of collateral could be discerned at anytime. Defendants contend that this amounts

to an allocation method that would save the PMSIs from being transformed into ordinary security interests.

In support of this argument, Defendants rely upon an unpublished decision from the United States District Court for the Northern District of Alabama. *AmSouth Bank of Alabama v. Associates Commercial Corporation*, No. 97–C–0177–5 (N.D.Ala. Feb. 7, 1997).[16] In *AmSouth*, AmSouth Bank of Alabama ("AmSouth") had a blanket first in time lien on all the debtor's equipment. Associates, as in the case before this court, had provided purchase money financing to the debtor. On two different occasions, Associates provided purchase money financing for the debtor to purchase equipment. On each occasion Associates entered into a security agreement that contained the identical cross-security provisions found in the agreements before this court. Of the two agreements, the debtor had extinguished all of the debt for one of them, leaving only one agreement outstanding.

Associates, after having received relief from the automatic stay, repossessed the item of equipment in question. AmSouth sought a preliminary injunction to prevent Associates from disposing of the proceeds from the equipment. AmSouth claimed Associates' PMSI had been transformed leaving AmSouth with a superior lien.

The court denied AmSouth's motion. The court found that AmSouth had not shown a likelihood of success on the merits. The court based this conclusion in part on a finding that Associates' security agreement contractually provided an allocation method in accordance with *Southtrust*. However, the court's finding was based upon the fact that AmSouth had conceded that the security agreement allocated payments to the one item of equipment only.

*AmSouth* is factually different from the case before this court. In *AmSouth*, only one security agreement remained outstanding; that is, the debtor had obligations due on only one of the two security agreements.

---

15. Pioneer sold the delimber to Debtor and assigned the security agreement to CIT the same day.

16. A copy of this unpublished opinion is attached as Exhibit A to Defendants' first post hearing brief.

In the case before this court, none of Defendants' security agreements have been extinguished. Debtor remains liable on all of the agreements. Also, the creditor in *AmSouth* conceded that the security agreement contained an allocation method. The creditor in the case before this court has made no such concession and indeed contends that an allocation method does not exist. As a result, the court does not find *AmSouth* helpful.

The court disagrees with Defendants' contentions with respect to an allocation method. In *Southtrust,* the Eleventh Circuit made it clear that there must be some allocation method provided in the contract. 760 F.2d at 1243. The fact that Defendants could at anytime determine how much the payoff would be for a particular piece of equipment alone does not comply with *Southtrust.* By the very language of the security agreements, the collateral for each agreement secured more than just the collateral purchased and there is no specific method provided in the security agreements for allocating payments. As a result, in accordance with the Eleventh Circuit's holding in *Southtrust,* because Defendants have not "contractually provide[d] some method for determining the extent to which each item of collateral secures its purchase money," Defendants have effectively given up their purchase money status.

Finally, Orix contends that a novation occurred when Associates modified the terms of its agreements with Debtor. Orix asserts this novation also results in Associates PMSIs being transformed into ordinary security interests. Because the court has determined that Associates' security interests were transformed into ordinary security interests by virtue of having exercised cross-

security clauses, the court need not address the novation claim.

### Orix's Security Agreements Are Enforceable

Next, the court will address whether Orix's security agreements are enforceable. Defendants make several contentions with respect to whether Orix 1 and Orix 2 are enforceable. Defendants argue that Orix 1 and Orix 2 are not enforceable, thereby leaving Defendants with superior first in time liens regardless of whether they have purchase money status. The court will now address each of Defendants' contentions.[17]

Defendants first claim that Orix 1 and Orix 2 (collectively "the 1990 notes") are unconscionable and amount to an unreasonable restraint of trade. Orix 1 and Orix 2 both contain "omnibus clauses," in which Debtor essentially pledged all of his property whether now owned or later acquired. Defendants contend that the "omnibus clauses" render the agreements unconscionable.[18]

According to the Georgia Supreme Court:

> An unconscionable contract is one abhorrent to good morals and conscience. It is one where one of the parties takes a fraudulent advantage of another. "An unconscionable contract is one such as no man in his senses, and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other."

*Hall v. Wingate,* 159 Ga. 630, 126 S.E. 796, 813 (1925) (quoting 4 Words and Phrases Second Series). Furthermore, the Georgia Supreme Court has stated that " 'The basic test is whether, in the light of the general commercial background and the commercial

---

**17.** In response to Defendants' contentions, Orix argues that Defendants' contentions amount to affirmative defenses that were not raised in the pleadings. Orix, therefore, asserts that these affirmative defenses have been waived. The court, however, disagrees. Rule 15(b) of the Federal Rules of Civil Procedure provides, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Defendants presented evidence at trial in support of their arguments. As a result, the court will treat Defendants' conten-

tions with respect to the enforceability of Orix's security agreements as if they had been raised in the pleadings.

**18.** In support of their argument, Defendants cite the case of *Matter of MacDonald,* 100 B.R. 714 (Bankr.D.Del.1989). In *MacDonald,* the court found that an omnibus clause was "per se" unconscionable. However, as pointed out by Orix and later acknowledged by Defendants, *MacDonald* was reversed by the district court in an unpublished decision.

needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.'" *R.L. Kimsey Cotton Company, Inc. v. J.D. Ferguson,* 233 Ga. 962, 965, 214 S.E.2d 360, 363 (1975) (quoting Comment 1 to U.C.C. § 2–302). Moreover, whether a contract is unconscionable "should be decided 'in the light of the background and commercial setting of the contractual provision.'" *Garbutt v. Southern Clays, Inc.* 894 F.Supp. 456, 463 (M.D.Ga.1995) (quoting *R.C. Craig, Ltd. v. Ships of the Sea, Inc.,* 345 F.Supp. 1066, 1074 (S.D.Ga.1972)).

■ The court finds that the 1990 notes are not unconscionable and do not unreasonably restrain trade. Taking into consideration the background and commercial setting, the clauses in question do not shock the conscience of the court. Accordingly, the omnibus clauses do not render the 1990 notes unenforceable.

Next, Defendants argue that the rates of interest charged by Orix are usurious. Defendants contend that all interest charges that are usurious should be applied to any principal balance. Defendants conclude that if the interest payments for the 1990 notes are applied to the principal balance, the principal will be paid in full. According to Defendants, this would result in the 1990 notes having been satisfied and extinguished, leaving Defendants with first in time security interests.

The parties disagree with respect to whether New York or Georgia law applies to determine if the 1990 notes are usurious. The security agreements in Orix 1 and Orix 2 both provide that the agreements are to be construed under the "law[s] of the state where the Mortgaged Property may be located or the residence or principal place of business of Mortgagor or Mortgagee, whichever renders each such provision effective...." ¶ *10 of Orix 1 and Orix 2.* The promissory notes that accompany the security agreements, however, contain no choice of law provision.

Defendants argue that pursuant to O.C.G.A. § 7–14–13 Georgia law governs. Section 7–14–13 provides:

Every contract shall bear interest according to the law of the place of the contract at the time of the contract, unless upon its face it shall be apparent that the intention of the parties was to adopt the law of another forum; in this case the law of that forum shall govern.

Defendants argue that the contracts were entered into in Georgia. Moreover, Defendants assert that because the promissory notes do not contain a choice of law provision, the parties have not intended for the law of another forum, that is New York, to apply and therefore Georgia law would apply by default. However, as the court will discuss *infra,* the same result is achieved by applying either state's law. Accordingly, it is unnecessary for the court to determine which state's law applies.

The promissory note for Orix 1 states on its face that "For the Purpose of Georgia Law the Annual Percentage Rate is 15.04%." Likewise, the promissory note for Orix 2 states on its face that "For the purpose of Georgia Law the annual percentage rate is 14.3%." In addition, each agreement contains a provision that states that any unpaid installments that have matured shall accrue interest at a rate equal to ⅟₁₅th of 1% per day until paid in full ("default rate").

Defendants base their arguments on Georgia law. Defendants argue that the rates of interest actually charged exceed the annual rates disclosed in the notes. Moreover, Defendants contend that Orix has failed to properly disclose the interest rate in simple interest terms, thereby constituting usury pursuant to O.C.G.A. § 7–4–2(a)(1)(A). Furthermore, Defendants claim that the 1990 notes are usurious because they do not provide for the rebate of any unearned interest upon acceleration as required by O.C.G.A. § 7–4–2(b). Defendants conclude this results in the rate of interest exceeding the disclosed rates in the notes.

■ With respect to Georgia law, the court finds the agreements are not usurious. Section 7–4–2(a)(1)(A) provides:

Notwithstanding the provisions of other laws to the contrary, except Code Section 7–4–18, the parties may establish by writ-

ten contract any rate of interest expressed in simple interest terms as of the date of the evidence of the indebtedness ... where the principal amount involved is more than $3,000.00 but less than $250,000.00.

As a result, a note must state the rate of interest in simple interest terms. Moreover, the parties can agree to any rate of interest as long as it does not exceed the rate specified in § 7–4–18. Section 7–4–18 provides that it is criminal in Georgia to have "any rate of interest greater than 5 percent per month." Accordingly, the parties can agree to an interest rate as long as it does not exceed 5 percent per month and is expressed in simple interest terms.

The 1990 notes, which are both for more than $3,000.00 but less than $250,000.00, state in simple terms the annual percentage rate. Moreover, the notes state in simple terms the rate of interest in the event of a default. Neither the rate listed as the annual percentage rate nor the default rate exceed the 5 percent per month limitation found in § 7–4–18.[19]

Moreover, the court finds that the fact that the notes do not provide for a rebate of interest upon acceleration does not make the notes usurious. Section 7–4–2(b) provides that "[u]pon acceleration of the maturity of any loan ... upon which interest has been precomputed, unearned interest shall be rebated to the debtor..." It is undisputed that the 1990 notes include precomputed interest. It is clear that Orix has an obligation to rebate the precomputed interest in accordance with § 7–4–2(b). However, the court does not find the 1990 notes are usurious merely because the notes do not contain a provision for rebating precomputed interest. The law requires the rebate regardless of whether the note so provides.

Defendants also contend Orix has violated Georgia law by charging interest on interest. For example, the 1990 notes provide for the default rate of interest to paid on any unpaid matured installments, which include accrued interest. The court, however, finds that this does not render the notes usurious under Georgia law.

■ In *Hardy v. G.A.C. Finance Corporation*, 131 Ga.App. 282, 205 S.E.2d 526 (1974), *aff'd*, 232 Ga. 632, 208 S.E.2d 453 (1974), the Georgia Court of Appeals found "[t]here is no inhibition against charging interest on interest which is past due." *See also Ray v. Pease*, 97 Ga. 618, 25 S.E. 360 (1895) (When contracted for, party is entitled to recover interest upon annual installments of interest from the time they became due.) As a result, the court finds no prohibition against contracting to charge interest on past due installments of interest, as long as the aggregate interest rate does not exceed 5 percent per month in accordance with O.C.G.A. § 7–4–18, which it does not for the 1990 notes.

■ As for New York law, the court also finds that the 1990 notes are not usurious. In *Manfra, Tordella & Brookes, Inc. v. Bunge*, 794 F.2d 61 (2d Cir.1986), the United States Court of Appeals for the Second Circuit ("Second Circuit") had to determine whether certain notes were usurious. The court determined that charges on past due accounts were not interest, but were service charges. *Id.* at 62. The court found that New York usury laws do not apply to defaulted obligations. *Id.* at 63, n. 3 (citations omitted). The court concluded that the interest charged in the case was charged only on past due debts and therefore usury laws did not apply. *Id.* In accordance with the Second Circuit's holding in *Bunge*, the court finds that Orix 1 and Orix 2 are not usurious under New York law.

Additionally, Defendants argue that Orix 3 and Orix 4 (collectively "the 1996 agreements") are also usurious. Defendants claim that the 1996 agreements do not state the interest rate in simple interest terms on the face of the agreements as required by Georgia law. Orix, however, contends that New York law governs the 1996 agreements. Moreover, Orix contends that the 1996 agreements are actually conditional sale contracts and therefore are not subject to usury laws.

19. The default rate of 1/15th of 1% per day amounts to less than a 25 percent annual rate.

Orix 3 and Orix 4, unlike Orix 1 and Orix 2, do contain a choice of law provision. The 1996 agreements provide that:

the parties agree that the validity, enforceability and effectiveness of each provision hereof and the obligations, rights and remedies of the Buyer, Seller, Guarantor and any Holder in any way related to or arising under this contract note shall be governed by and construed in accordance with the laws of the State of New York (excluding its choice of law rules).

Despite this provision, Defendants argue that Georgia law applies.

■■■ Georgia conflicts of law rules determine whether New York or Georgia law applies. *Bryan v. Hall Chemical Company,* 993 F.2d 831, 834 (11th Cir.1993) (citing *Nordson Corp. v. Plasschaert,* 674 F.2d 1371 (11th Cir.1982)). Moreover,

Georgia will honor choice of law provisions unless no reasonable basis exists for doing so or, application of the chosen state's law is contrary to a fundamental policy of Georgia which has a materially greater interest in the issue than the chosen state.

*Id.; see also Nasco, Inc. v. Gimbert,* 239 Ga. 675, 676, 238 S.E.2d 368, 369 (1977) ("The law of the jurisdiction chosen by parties to a contract to govern their contractual rights will not be applied by Georgia courts where application of the chosen law would contravene the policy of, or would be prejudicial to the interests of, this state").

■■■ The court finds that New York law governs. The 1996 agreements provide that New York is the choice of law. Georgia courts would enforce this provision absent an overwhelming public policy to the contrary. The court does not find any overwhelming public policy reason to not enforce the choice of law provision in the 1996 agreements. *See, e.g., Commercial Credit Plan, Inc. v. Parker,* 152 Ga.App. 409, 263 S.E.2d 220 (1979)(Georgia court determined South Carolina law would apply to contract that would be usurious in Georgia but would not be usurious in South Carolina, when contract was made in South Carolina); *see also Ryder Truck Lines, Inc. v. Goren Equipment Co., Inc.,* 576 F.Supp. 1348, 1354 (N.D.Ga. 1983)(Court applied Florida law as provided

in the contract with respect to questions of interest and attorney fees).

■■■ Defendants claim that the 1996 agreements are not actually conditional sale contracts although denominated as such and are therefore subject to usury laws. Moreover, Defendants question the enforceability of the 1996 agreements, claiming that the notes are infected with usury. Defendants' arguments appear to recognize that in New York, a time-price sale such as a conditional sale contract is not subject to usury laws. *See DeSimon v. Ogden Associates,* 88 A.D.2d 472, 454 N.Y.S.2d 721 (N.Y.App.Div.1982). However, regardless of whether the 1996 agreements are actually conditional sale contracts is immaterial because in New York the defense of usury is not available to a corporation. *N.Y. Gen. Oblig. Law.* § 5–521 ("No corporation shall hereafter interpose the defense of usury in any action"); *see also Credit Alliance Corporation v. David O. Crump Sand & Fill Co.,* 470 F.Supp. 489, 493 (S.D.N.Y.1979)("The defense of usury ... is unavailable in New York to corporate defendants"). Both defendants are corporations and as such do not have the defense of usury available to them under New York law.

In a final attempt to have Orix 3 declared unenforceable, Defendants claim that C.A. Credit never signed or accepted the agreement. Orix 3 does not have a handwritten signature for C.A. Credit. There is, however, typed "C.A. Credit" on the acceptance line of the agreement. In the place where a C.A. Credit representative would have signed is Mr. Hughes' printed name. The Orix representative, who is also a C.A. Credit representative, testified that he could not explain why Mr. Hughes' name was handwritten in the place where C.A. Credit would have signed. Defendants claim that C.A. Credit has not accepted the agreement. Therefore, Defendants conclude that there is no written agreement in violation of the statute of frauds.

The court disagrees with Defendants' contentions. Section 1–201(39) of New York's version of the Uniform Commercial Code defines "signed" to "include any symbol executed or adopted by a party with present

intention to authenticate a writing." Furthermore, the Official Comment to § 1–201(39) provides:

> The inclusion of authentication in the definition of "signed" is to make clear that as the term is used in this Act a complete signature is not necessary. Authentication may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases may be found in billhead or letterhead. No catalog of possible authentications can be complete and the court must use common sense and commercial experience in passing upon these matters. The question always is whether the symbol was executed or adopted by the party with the present intention to authenticate the writing.

*N.Y. U.C.C. Law § 1–201(39), Official Comment.*

■ The court finds that C.A. Credit has signed Orix 3. The court finds that by typing "C.A. Credit" on the line denominated "Accepted," C.A. Credit has accepted the agreement pursuant to § 1–201(39) as explained in the Official Comment. As a result, the court finds no merit in Defendants' contentions with respect to Orix 3, and the court finds that the 1996 agreements, Orix 3 and Orix 4, are enforceable pursuant to New York law.

### Orix's Claim

The court will now address whether Orix has properly proven the amount of its claim. In the complaint, Orix requests that the court order CIT and Associates to turn over to Orix any adequate protection payments they received from Debtor. Moreover, Orix requests that CIT and Associates turn over the proceeds from any of the items of equipment in question in this adversary proceeding. Finally, Orix requests that the court enter a judgment for the amount of the adequate protection payments and proceeds.

Defendants contend before the court can order any turnover of proceeds or adequate protection payments, that Orix must properly prove the amount of its claim. Defendants claim that Orix has not properly proven the amount of its claim. Specifically, Defendants argue that Orix has improperly added to its claim twenty percent for attorney fees. Orix's agreements provide for a recovery of twenty percent for attorney fees if the notes are placed in the hands of an attorney for collection. Defendants, however, contend that the fees must be reasonable and Orix must ask the court to determine the reasonableness of the fees.

Defendants also disagree with Orix's accrual of interest at the default rate as set out in Orix's agreements. Orix has added to its claim late charges that accrue at a rate of $\frac{1}{15}$ th of 1% in accordance with the 1996 agreements. Finally, Defendants question whether Orix has properly applied the adequate protection payments it has received during the pendency of Debtor's bankruptcy case. Orix has applied the payments to the total figure of prepetition principal, accrued interest and attorney fees, not just to principal.

In response, Orix claims that it is appropriate pursuant to § 506(b) of the Code for Orix to recover appropriate attorney fees and postpetition interest.[20] Orix, however, has agreed to allow the court to determine the reasonableness of the attorney fees at a later date, presumably by motion of Orix for approval of its fees. Moreover, Orix has agreed to apply the adequate protection payments received during the bankruptcy case to principal. According to Orix's calculations, the payoff of its claim at the petition date was $268,378.91. Orix calculates the adequate protection payments received from Debtor to be $20,900.00. Moreover, Orix calculates the late charges to be $57,089.52 from the petition date to the date of the trial of this matter. Orix claims the default charges accrue at the rate of $200.26 per day.

---

**20.** Section 506(b) provides:
To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.
11 U.S.C. § 506(b).

Finally, Orix contends that the twenty-percent for attorney fees equals $60,913.69.[21]

The court finds (1) because Orix has agreed to apply adequate protection payments to principal and (2) because Orix has agreed to seek separate court approval of its attorney fees, that the only matter at issue with respect to Orix's claim centers around whether Orix is entitled to receive the default interest. Orix contends that the late charges are enforceable under bankruptcy law.

■ Pursuant to § 506(b), for a creditor to receive interest on its claim, (1) the creditor must be oversecured, and (2) the agreements must provide for the interest. Orix claims that both conditions are met here and as a result it is entitled to interest on its claim in the form of the late charges. Moreover, in discussing "such claim" in § 506(b) of the Code, the Supreme Court has stated "the natural reading of the phrase entitles the holder of an oversecured claim to postpetition interest and, in addition, gives one having an oversecured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

Defendants contend that for a creditor to be entitled to postpetition interest the creditor must be oversecured and the estate must be solvent. It is undisputed that Orix is oversecured.[22] In support of their position, Defendants cite an earlier case from this court. In *In re Scarborough*, 1992 WL 672983 (Bankr.M.D.Ga. Dec. 31, 1992), this court had to address whether an unsecured creditor is entitled to postpetition interest on its claim.

■ This court found that because the debtor was solvent postpetition interest was appropriate to an *unsecured* creditor. The court also recognized that pursuant to Eleventh Circuit authority in *Equitable Life Assurance Society v. Sublett (In re Sublett)*,

895 F.2d 1381 (11th Cir.1990), a creditor can receive interest on its claim when the creditor is oversecured *or* the debtor's estate is solvent. *Id.* at *3. However, as pointed out by the court in *In re Florida Precast Concrete, Inc.*, 144 B.R. 928, 929 (Bankr.M.D.Fla. 1992), when a creditor is oversecured, solvency is not required for the creditor to be entitled to postpetition interest and fees. The court finds that in accordance with § 506(b) of the Code, Orix is entitled to postpetition interest on its claim.

Defendants contend that if Orix is entitled to postpetition interest on its claim, the approximately twenty four percent default rate provided for in its agreements is exorbitant. The court, however, disagrees. The court finds that the default rate provided for in the agreements is appropriate. *See Warehouse Home Furnishings Distributors, Inc. v. Gladdin (In re Gladdin)*, 107 B.R. 803, 806 (Bankr.M.D.Ga.1989); and *In re Scarborough, supra* at *4.

■ Defendants also contend that Orix is not entitled to the postpetition charges because its debt was not accelerated prior to the bankruptcy petition. At trial, the Orix representative ultimately concluded that the debt from the 1996 agreements was accelerated by at least the time Debtor had filed the bankruptcy petition. Moreover, the 1996 agreements provide, in relevant part:

> If Buyer fails to pay any amount when due, or defaults in the prompt and faithful performance of any of the terms and conditions hereof or any other agreement with Holder, or becomes insolvent, or changes its management, operations, ownership of its stock or control, or dissolves, or if bankruptcy, receivership or any other insolvency proceeding is instituted by or against Buyer ... then Holder may *without notice or demand, all of which are expressly waived, declare the entire unpaid Time Balance due and payable.*

---

21. This figure is reached by taking twenty percent of the total of the payoff at the petition date less the adequate protection payments plus the accruing late charges. That is, $268,378.91—$20,900.00 + $57,089.52 = $304,568.43, twenty percent of which is $60,913.69.

22. This is in light of the court's ruling, discussed *supra*, regarding Defendants' PMSIs having been transformed into normal security interests.

(emphasis added). The court finds that, after careful review of the testimony of the Orix representative, Orix accelerated the indebtedness at least by the time Debtor filed bankruptcy.

Defendants cite the case of *First Federal Savings & Loan Association of Warner Robins v. Standard Building Associates, Ltd. (In re Standard Building Associates, Ltd.)*, 85 B.R. 644 (Bankr.N.D.Ga.1988), in support of their contentions. In *Standard Building*, the court determined that a debt had not been accelerated. In that case, the security deed note did not provide for automatic acceleration in the event of default or for waiver of notice of acceleration. The security deed itself, however, did contain a waiver of notice of acceleration. *Id.* at 648. The court found the documents to be in conflict and ultimately construed the documents against the drafter. As a result, the court concluded that in the event of default there was not automatic acceleration or waiver of notice of intent to accelerate. *Id.*

The court agrees with the holding in *Standard Associates,* but does not find it to be helpful to the case before the court. The agreements before this court are not in conflict. In fact, each of the 1996 agreements is encompassed in one document, that is, the conditional sale contracts. There are not separate agreements that conflict. As stated *supra,* the court finds that the testimony of the Orix representative at trial indicates Orix had accelerated the indebtedness at least by the time Debtor filed bankruptcy.

Accordingly, the court calculates Orix claims as follows:

1. As of the petition date: $268,378.91
2. Minus adequate protection payments: [$ 20,900.00]
3. Plus default interest charges from petition date to March 11, 1998, the date of the trial $ 57,089.52
4. Interest charges since trial of $200.26 per day (as of August 17 159 days) $ 31,841.34
5. Total $336,409.77

The court has not included any amount for attorney fees and expects Orix to file a motion pursuant to § 506(b) to have any attorney fees approved by the court in that manner.

### Marshalling

■ Next, Defendants request should the court rule the way it has stated it will, that the court require Orix, pursuant to the doctrine of marshalling of assets, to seek recourse from other sources before availing itself of the items in dispute in this adversary proceeding. *See Matter of Royal,* 75 B.R. 50, 54 (Bankr.S.D.Ga.1987) (Under doctrine of marshalling of assets, court can compel one creditor "to look first to assets over which it alone holds a lien prior to proceeding to liquidate assets on which there are junior liens"). Orix suggest that the court fashion an equitable remedy as follows:

The Court can adjudge that ORIX is entitled to recover all of its collateral (including all of the disputed equipment and its proceeds). The Court can further order that when ORIX collects enough money to satisfy its claim against Hughes in full, ORIX shall be obligated to tender into the Court any additional collateral that it then has. That additional collateral would be any excess proceeds it received from any liquidation sale and any remaining security interest it had against the debtor. The Court could then divide that additional collateral among Defendants as appropriate.

*Orix's Reply Brief,* page 25. The court will not goes as far as Orix's proposal. Instead, the court will simply order Orix to first attempt to satisfy its claim through equipment in which there is no junior lien-holder. If its claim is not fully satisfied, then Orix can seek to recover its claim from the equipment disputed in this adversary proceeding and any proceeds thereof.

Finally, the court will address whether Orix is entitled to a money judgment for the proceeds of collateral that Associates has already repossessed and sold. At the conclusion of evidence, Orix asserted its right to a money judgment for $270,000.00, the purported value of the disputed equipment that Associates has already sold. Defendants contend that Orix did not ask for such a remedy in its complaint and as such is not entitled to such a judgment.

In its complaint, Orix requests that the court order Defendants to turn over any equipment that has already been repossessed or the proceeds thereof. As a result, that is what the court will order. Defendants will be required to turn over any equipment that they have already repossessed and turn over any of the proceeds of any equipment that Defendants have already sold. However, as previously discussed, the court will require Orix to first attempt to satisfy its claim with equipment in which it holds the sole lien before attempting to recover any amounts from Defendants.

## CONCLUSION

In conclusion, the court finds that Orix holds a superior security interest in the equipment that is the subject of this adversary proceeding. The court finds that Orix's agreements are not usurious and are otherwise enforceable. Moreover, the court finds that Orix's claim, as of August 17, 1998 is $336,409.77, exclusive of attorney fees. Should Orix wish to recover its attorney fees, it will need to bring an appropriate motion pursuant to § 506(b) of the Code. The court will require Orix to first seek to satisfy its claim from equipment that is not the subject of this adversary proceeding. Should Orix not fully satisfy its claim from the undisputed equipment, Defendants will then be required to turn over the disputed equipment and any proceeds thereof to Orix. Any proceeds remaining after Orix satisfies its claim will be required to be returned to Defendants.

## APPENDIX A
## ASSOCIATES EQUIPMENT

| # | Equipment | Security Agreement | UCC–1 |
|---|-----------|--------------------|-------|
| 1 | Prentice Model 210D Log Loader S/N 51103, equipped with John Deere 6059T Power Unit S/N: 408321, CX762 Grapple, S/N: A40957, 60 inch Jackson Circle Saw, S/N: J60S–1594, 37 foot Big John Loader Trailer, S/N: 1B9MC4024PFBJ0617. | Signed 1/14/94. Assigned to Associates on 1/18/94. | Filed 1/18/94, covering: Prentice Model 210D Log Loader S/N 51103, equipped with John Deere 6059T Power Unit S/N: 408321, CX762 Grapple, S/N: A40957, 60 inch Jackson Circle Saw, S/N: J60S–1594, 37 foot Big John Loader Trailer, S/N: 1B9MC4024PFBJ0617. |
| 2 | John Deere Model 648E Skidder S/N DW648ES545868 | Signed and Assigned to Associates on 7/22/94. | Filed 7/28/94, covering: John Deere Model 648E Skidder S/N DW648ES545868; Prentice Model 210D Log Loader S/N 51103, equipped with John Deere 6059T Power Unit S/N: 408321, CX762 Grapple, S/N: A40957, 60 inch Jackson Circle Saw, S/N: J60S–1594, 37 foot Big John Loader Trailer, S/N: 1B9MC4024PFBJ0617; and Franklin Model HTFB 300 Feller Buncher S/N 15510 |
| 3 | John Deere Model 648G Grapple Skidder S/N DW648GS550849 | Signed and Assigned to Associates on 5/3/95. | Filed 5/9/95, covering: John Deere 648G Grapple Skidder S/N DW648GS550849 |
| 4 | Tigercat 720 Fellerbuncher S/N 7201140; and Koehring 20 inch Saw Head S/N 63661 | Signed and Assigned to Associates on 5/25/95. | Filed 5/30/95, covering: Tigercat 720 Fellerbuncher S/N 7201140; and Koehring Saw Head S/N 63661 |

| 5 | Tigercat 845 Fellerbuncher S/N 8450111 | Signed 7/24/96. Assigned to Associates in August 1996. | Filed 8/1/96, covering: Tigercat Fellerbuncher Model 845 S/N 8450111 |
| 6 | Koehring 20 inch Saw S/N 960277 | Signed and Assigned to Associates on 3/11/97. | Filed 3/17/97, covering: Koehring 20 inch Saw S/N 960277; and Tigercat 845 Fellerbuncher S/N: 845011. |

## APPENDIX B
### *CIT EQUIPMENT*

| # | Equipment | Security Agreement | UCC–1 |
|---|-----------|--------------------|-------|
| 1 | Timberjack Model 450C Grapple Skidder S/N CE4369 | Signed 5/4/95. | Filed 5/17/95, covering: Timberjack Model 450C Grapple Skidder S/N CE4369 |
| 2 | Hood Model 20000 Log Loader S/N 204839; Jackson Self–Propelled Carrier S/N JSPC–4X–595–20H; and Jackson 60″ Slasher Saw S/N JS60–5595 | Signed 5/4/95. | Filed 5/11/95, covering: Hood Model 20000 Log Loader S/N 204839; Jackson Self–Propelled Carrier S/N JSPC–4X–595–20H; and Jackson 60″ Slasher Saw S/N JS60–5595 |
| 3 | Timberline Stroke Delimber Model 3510A S/N C500–080T | Signed and assigned to CIT on 9/30/95. | Filed 10/23/95, covering: Timberline Stroke Delimber Model 3510A S/N C500–080T |